Scott E. Randolph (ISB #6768)
A. Dean Bennett (ISB #7735)
HOLLAND & HART LLP
800 West Main Street, Suite 1750
Post Office Box 2527
Boise, Idaho  83701-2527
Telephone:  (208) 342-5000
Facsimile:   (208) 343-8869
serandolph@hollandhart.com
adbennett@hollandhart.com

Michael D. Wexler *(pro hac vice pending)*
Justin K. Beyer (*pro hac vice pending*)
SEYFARTH SHAW LLP
131 South Dearborn Street
Suite 2400
Chicago, Illinois  60603
Telephone:  (312) 460-5000
Facsimile:  (312) 460-7000

Attorneys for Plaintiffs

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| WALGREEN CO., an Illinois corporation; and OPTION CARE ENTERPRISES, INC., a Delaware corporation; | Case No.  1:14-cv-00300 |
| Plaintiffs, | **COMPLAINT FOR EXPEDITED INJUNCTIVE AND OTHER RELIEF** |
| v. | |
| SCOTT BONNEMA, an individual; NANCY MANN, an individual; JODIE MATOTT, an individual; PHARMACY SOLUTIONS, INC., a Wyoming corporation; | |
| Defendants. | |

Plaintiffs WALGREEN CO. and OPTION CARE ENTERPRISES, INC. (collectively,

"Walgreens"), for their Complaint for Expedited Injunctive and Other Relief against Defendants

SCOTT BONNEMA ("Bonnema"), NANCY MANN ("Mann"), JODI MATOTT ("Matott") (collectively, the individual defendants are referred to as the "Individual Defendants"), and PHARMACY SOLUTIONS, INC. ("Pharmacy Solutions") (collectively with the Individual Defendants, hereinafter referred to as "Defendants"), state as follows:

## BRIEF NATURE OF THE ACTION

1.      This is an action for breach of contract, actual and/or threatened misappropriation of trade secrets, and tortious interference with contract as well as business expectancy. Walgreens seeks preliminary and permanent injunctive relief in addition to other relief.

2.      For the past several years, Scott Bonnema, Nancy Mann, and Jodi Matott all worked for Critical Care Systems, Inc. ("CCS"), which Walgreens acquired in a stock purchase deal in November 2013.  Each served as the pharmacy manager, nurse manager, and patient service representative, respectively.  In these positions, they managed and ran the Boise, Idaho branch for CCS, including helping establish and maintaining customer relationships with the specialty pharmacy patients for CCS in the region.  In these positions, CCS entrusted the Individual Defendants with its trade secrets and confidential information, including corporate sales and marketing strategies for the market, as well as CCS's most valued customers and the referral sources (i.e., hospitals and medical providers for patients needing home infusion therapy) through which Walgreens and CCS gained a large number of its clients.  They also helped develop and had access to CCS's confidential pricing, pricing margins, marketing strategies, product development strategies, and overall business strategies relating to CCS's Infusion business in Boise, Idaho.

3.      In September 2013, Walgreens announced plans to acquire CCS through a stock purchase deal, a deal which closed on November 1, 2013.  Through this deal, Walgreens

acquired all of CCS's specialty pharmacy business, trade secrets, and contracts, including its restrictive covenant agreements.

4.       Shortly after that announcement was made, on information and belief, Pharmacy Solutions Inc., a Wyoming corporation headquartered in Casper, Wyoming, launched plans to open a Boise, Idaho branch.  However, rather than using fair means by which to compete, its plan instead sought to pick off former CCS employees, put them into the same market in which they previously worked and—despite those employees, including Bonnema and Matott, being bound by reasonable restrictive covenants—soliciting the same former customers.

5.       Like Walgreens, Pharmacy Solutions is a home infusion therapy provider, specializing in providing specialized home infusion, pharmacy and nursing services, patient advocacy and reimbursement support, immunoglobulin therapy, antibiotics, total parenteral nutrition, and other services.  Before hiring the Individual Defendants, Pharmacy Solutions had no market presence in Boise, had no customers in Boise, and had no specialty pharmacy in Boise.

6.       On December 19, 2013, Mann resigned from CCS/Walgreens.  Bonnema's and Matott's last day with CCS/Walgreens was January 9, 2014.

7.       But, now, in its post-termination investigation, Walgreens uncovered that the Individual Defendants each, including prior to their termination of employment with Walgreens, are actively soliciting and moving Walgreens' customers to Pharmacy Solutions, utilizing Walgreens' trade secrets and in violation of certain restrictive covenant agreements.

8.       Indeed, because the identity, conditions, drug needs, therapies, treatment schedules, and physicians are protected under HIPAA and treated as confidential by any

specialty pharmacy, the Individual Defendants are clearly using and improperly disclosing such information to Pharmacy Solutions.

9.      To date, Walgreens is aware of nine customers who have already left it for Pharmacy Solutions, costing it $48,500 in sales for each month these customers continue to work with Pharmacy Solutions, and causing it in excess of $200,000 in losses already.

10.     Pharmacy Solutions now seeks to utilize Walgreens' and CCS's head start in this area and seeks to erode Walgreens' standing in the market by hiring a number of its former employees and utilizing Walgreens' information to improperly compete in the marketplace. Indeed, the knowledge and information that the Individual Defendants possess would enable Pharmacy Solutions to save hundreds of thousands of dollars in start-up costs and erode Walgreens' trade secrets, confidential and proprietary business information, customer relationships, and goodwill.  Most troubling, Pharmacy Solutions is or should be aware that Bonnema and Matott are bound by restrictive covenant agreements that would prevent their very solicitations now, but, despite this, have place each in a sales and marketing role in the infusion space that directly violates their restrictive covenants.

11.     The Individual Defendants cannot perform their duties at Pharmacy Solutions without actually and inevitably threatening to disclose Walgreens' trade secrets and confidential and proprietary information.

12.     Accordingly, Walgreens seeks to preliminarily and permanently enjoin the Individual Defendants from using or threatening to use or inevitably using Walgreens' confidential and/or trade secret information and from interfering with Walgreens' customer relationships and referral sources.  In addition, Walgreens seeks to preliminarily and permanently

enjoin Bonnema and Matott from their ongoing breach of certain reasonable post-employment contractual obligations owing to Walgreens.

13.     Absent such injunctive relief, Walgreens faces irreparable injury, including the loss of customers and referral sources, its competitive advantage, its trade secrets, and its goodwill in amounts which may be impossible to determine unless the Individual Defendants are enjoined and restrained by order of this Court.

## PARTIES

14.     Walgreen Co. is a corporation organized and existing under the laws of the State of Illinois, with its principal place of business in Deerfield, Illinois.

15.     Option Care Enterprises, Inc. is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Deerfield, Illinois.  Option Care is also known as Walgreens Specialty Infusion Pharmacy.

16.     Pharmacy Solutions, Inc. is a corporation organized and existing under the laws of the State of Wyoming, with its principal place of business in Casper, Wyoming.  Pharmacy Solutions is registered to do business in and does business in Idaho.

17.     Scott Bonnema was employed by CCS starting in September 2008 until on or around January 9, 2014.  He is domiciled in and a resident of Eagle, Idaho.

18.     Nancy Mann was employed by CCS starting in October 2012 until on or around December 19, 2013.  She is domiciled in and a resident of Meridian, Idaho.

19.     Jodi Matott was employed by CCS starting in October 2008 until on or around January 9, 2014.  She is domiciled in and a resident of Caldwell, Idaho.

## JURISDICTION AND VENUE

20.     This Court has original jurisdiction over this action under 28 U.S.C. § 1332 because the parties are citizens of different states (Walgreens Co. is an Illinois corporation, headquartered in Illinois; Options Care Enterprises, Inc. is a Delaware corporation, headquartered in Illinois; the Individual Defendants are all domiciled in and residents of Idaho; and Pharmacy Solutions is a Wyoming corporation, headquartered in Wyoming) and the matter in controversy exceeds $75,000.00 excluding interest and costs.

21.     This Court has personal jurisdiction over Defendants, and venue is proper in this District under 28 U.S.C. § 1391(a) because all of the Defendants either reside and/or conduct business in Idaho and within the venue of this court, and because the Defendants have committed and continue to commit tortious acts in and/or related to this State and regularly conduct business in Idaho.

## EVENTS GIVING RISE TO THIS ACTION

### WALGREENS' INFUSION BUSINESS

22.     Walgreens (and, before its stock purchase of CCS, CCS) is an industry leader in infusion therapy.  Infusion therapy involves the administration of medication through a needle or catheter to people in their homes or alternative locations.  Walgreens' infusion services include the clinical management of drug therapies, nursing support, and care coordination.  Consequently, home infusion therapy is a comprehensive medical therapy.

23.     While typically infusion therapy involves drugs administered intravenously, infusion therapy also includes non-oral routes, such as intramuscular injections and epidural routes (including into the membranes surrounding the spinal cord).

24.     Infusion therapy falls into two categories, core and specialty therapies.  Core therapies generally include antibiotic, total parenteral nutrition ("TPN"), antifungal, antiviral,

chemotherapy, hydration, inotropic heart medications, corticosteroids, and pain management. Specialty therapies generally include rare and chronic conditions, such as blood factor disorders, erythropoietin, infliximab, growth hormones, immunoglobulin, and natalizumab.

25.     Home infusion therapies were developed due to the often long-term medical needs of patients.  Generally individuals receiving specialty therapies and TPN therapies require long-term or permanent care.  Because of this, inpatient care is not preferred due to the expense, but also because it prevents individuals from resuming normal lifestyle or work activities.

26.     Moreover, because the conditions for which patients are being treated tend to be both rare and long-term, the medications which they are prescribed tend to cost thousands of dollars per month.

27.     Walgreens' Infusion Services branch pharmacies are closed-door pharmacies that specialize in providing infusion therapies to patients.  To receive such accreditation, Walgreens must satisfy licensing and other regulatory requirements imposed by state pharmacy boards as well as accreditation standards required by most third-party payers.

28.     Once a patient is discharged from the hospital, Walgreens works with patients, utilizing its local, accredited Infusion Services branch pharmacy that mixes and arranges for or administers the drugs for the patient.

29.     Because of the specialty nature of such pharmacies, they are not open to the public and generally patients learn of such pharmacies through their insurance provider or through referrals from doctors, specialty infusion or discharge nurses in the hospital, or hospitals and their administrators.

30.     Walgreens (and, before it, CCS) obtains the vast majority of its customers through these referral sources.  Typically, patients who suffer from the type of illnesses for which a home

infusion therapy is appropriate are seen by a specific set of care providers at a hospital, clinic, or practice.  Walgreens and CCS spend significant time and substantial resources in developing relationships with the doctors, nurses, and administrators who care for these types of patients and who will recommend the patient to a specialty pharmacy.

31.     Based on this, Walgreens develops a customized care plan focused on a patient's home infusion therapy needs.

32.     To properly administer these drugs, Walgreens employs an extensive array of professionals, including pharmacists, infusion nurses, as well as individuals involved in patient assessment and admission, education and training, care planning and coordination, care management by clinical infusion pharmacists, and trouble-shooting and treatment plan oversight.

33.     Walgreens further provides support to its customers through its local, multidisciplinary team of clinicians and support staff who provide: (a) 24-hour access to a clinician; (b) patient and caregiver education, training, and monitoring; (c) reimbursement assistance coordination; (d) regular communication with a patient's doctor concerning the patient's treatment; and (e) professional, friendly, and compassionate support.

34.     Walgreens measures success by efficiently producing consistent results, results that enhance confidence and improve people's lives.  Walgreens does so by ensuring that its patients' drugs are compounded in a sterile environment, maintaining the drugs in the proper environment to ensure sterility and stability, administering dosages in the proper amounts and on the proper schedule, using the appropriate access device, and monitoring for adverse reactions and therapeutic efficacy.

35.     Walgreens invests substantial time and money investing in sales representatives and management who cultivate and maintain long-term relationships with doctors, hospitals, and

other managed health organizations.  These relationships often take years to establish and are crucial to the success of its business, which relies almost entirely on referrals.

36.     Because Walgreens and CCS operates and employs both the pharmacy and the caregivers who administer the drugs, Walgreens and CCS often establish long-term, near permanent relationships with the patients who receive home infusion therapies.

37.     The home infusion industry is highly competitive, multi-billion dollar industry with only approximately 1,500 infusion pharmacy locations nationwide, compared with approximately 67,000 standard pharmacies nationwide.  One of Walgreens' newest and direct competitors is Pharmacy Solutions, a home infusion company that focuses its business in the infusion area and who opened a Boise, Idaho office this year.

## THE INDIVIDUAL DEFENDANTS' EMPLOYMENT WITH CCS & CCS'S CONFIDENTIAL INFORMATION

38.     Bonnema was employed by CCS starting in September 2008 until January 9, 2014.

39.     Matott was employed by CCS starting in October 2008 until January 9, 2014.

40.     Mann was employed by CCS starting in October 2012 until December 19, 2013.

41.     CCS is and was one of the nation's largest providers of specialty infusion services in home-based and ambulatory settings.

42.     From September 2008 until his termination in January 2014, Bonnema served as CCS's pharmacy manager for its Boise, Idaho specialty pharmacy.  In this position, Bonnema was responsible for directing high quality pharmacy services and providing medical supplies to customers and patients in accordance with established policies, procedures, and laws. Specifically, Bonnema was responsible for, amongst other things:

     (a)     Directing pharmacy and operation functions to ensure effective operations;

(b)     Preparing prescriptions, solutions, and medications accurately and promptly;

(c)     Conducting initial and ongoing assessment of specific patient, drug and disease information to identify real and potential drug-related problems or needs;

(d)     Monitoring quality assurance programs;

(e)     Interfacing with physicians and referral sources;

(f)     Serving as a drug-information resource to the sales forces and participating in team selling and sales support;

(g)     Participating in the development of the branch budget for pharmacy operations; and

(h)     Performing marketing support.

43.     From October 2008 until her termination in January 2014, Matott served first as a pharmacy technician and then as a Patient Service Representative for its Boise, Idaho specialty pharmacy.  In these positions, Matott was responsible for, amongst other things:

(a)     Performing pre-delivery telephone calls to patients, nursing staff, or other agencies to monitor patient supply inventories and determining specific needs;

(b)     Acting as a liaison between CCS and the patient;

(c)     Generating pick lists for patient orders;

(d)     Preparing patient information packets;

(e)     Participating in daily meetings with pharmacy, nursing, and reimbursement;

(f)     Performing individual delivery of patient orders and conducts in-home patient supply inventories; and

(g)     Coordinating and performing operation activities including: (i) inventory control and monitoring inventory levels; (ii) preparation of purchase orders; (iii) placing orders with vendors; (iv) receiving incoming orders; and (v) stocking, rotating, and maintaining inventory.

44.     From October 2012 until her termination in December 2013, Mann served first as per diem nurse and then as CCS's Nurse Manager for Boise, Idaho.  In these positions, Mann was responsible for, amongst other things:

    (a)    Providing input to annual business/marketing plans and budget for nurses services;

    (b)    Conducting cost analyses and monitoring operating expenses for nursing services;

    (c)    Conducting case conferences and surveys to ensure service quality for nursing services and participating in case conferences;

    (d)    Working with functional areas to ensure coordination of client intake/scheduling/care plan development/resource utilization for nursing services and obtaining physician orders for nursing services and addressing resolution of client issues;

    (e)    Performing nursing service roles;

    (f)    Directing marketing and promotional activities for nursing services within the community;

    (g)    Supporting company relationships with key manufacturers in providing consultation, in-service education, and in supporting "pull-through" business at the payor and local physician levels; and

    (h)    Working directly with company customers and referral sources to establish relationships and to build customer base.

45.     In their roles, the Individual Defendants acquired intimate knowledge of and experience with CCS's biggest referral sources and customers in the Boise, Idaho market.

46.     Moreover, in their roles, the Individual Defendants worked directly with CCS's customers and referral sources.

47.     In particular, in their roles as Patient Services Representative and Nursing Manager, Matott and Mann, respectively, worked extensively with CCS's customers and referral sources.

48.     The relationships that CCS (and subsequently, Walgreens) forms with customers receiving specialty infusion drugs and services are long-standing and near permanent relationships.

49.     Accordingly, CCS (and subsequently, Walgreens) treats such customer relationships as the lifeblood of its business and treats the identities, needs, and other information relating to their referral sources and customers as highly confidential.

50.     To that end, CCS conducted regular training relating to the confidentiality of proprietary company information, which the Individual Defendants attended.

51.     Based on their roles and responsibilities, each of the Individual Defendants had direct knowledge of and access to CCS's confidential information and trade secrets relating to its Boise, Idaho operations, specifically its: (a) pricing; (b) customer retention strategies; (c) its marketing strategies; (d) intimate knowledge of CCS's customers, needs, therapies, length of therapies, and insurance that each customer utilized, and schedule for which customers needed their drugs administered; (e) intimate knowledge of CCS's referral sources, including the insurance that each referral source accepted; and (f) CCS's policies and procedures for operating and managing its Boise, Idaho specialty pharmacy and operations.

52.     Prior to Pharmacy Solutions' hire of the Individual Defendants, Pharmacy Solutions had an extremely limited presence in the state of Idaho and had no customers or patients, no referral sources, and no specialty pharmacy, whatsoever, in Boise, Idaho.

53.     Additionally, given their positions, the Individual Defendants had access to and developed CCS's confidential information about CCS's infusion customers, what products they purchased, when such products were purchased, and pricing information relating to those customers.

54.     Moreover, the Individual Defendants had access to and knew the hospitals and physicians who are writing prescriptions for home infusion, the therapies, length of therapies, and insurance that each referral source accepts, and the turnaround time between when a new patient is brought on board and when drugs are administered.

55.     CCS's confidential information (now Walgreens' based on the stock purchase of CCS) discussed above is not available to the public, is of great value to it and would give any of its competitors who acquired such information, including Pharmacy Solutions, an unfair competitive advantage.

56.     CCS requires that its information be kept strictly confidential by its employees and restricts access to this information.  CCS takes specific and rigorous measures to preserve the confidentiality of this information, including but not limited to, the following:

   (a)     requiring employees to sign confidentiality agreements containing covenants designed to maintain confidentiality and to return its property upon termination;

   (b)     requiring its employees to maintain confidentiality of its information and protect its assets;

   (c)     prohibiting the use of its materials not directly related to its business, or the removal or borrowing of its property without permission;

   (d)     using a lock and key to restrict access to and within its facilities to which the Individual Defendants had access;

   (e)     prohibiting the use of its computer systems for non-company purposes;

   (f)     restricting access to its computerized information through the use of passwords;

   (g)     prohibiting the unauthorized physical removal of company information (via paper, disc, flash drive or other media) and electronic transmission of such information (via email or other means); and

   (h)     also restricting access to its computerized company information based on each individual employee's "need to know" the particular information.

57.    CCS rigorously maintains the confidentiality of its information because the information provides it a competitive advantage in the marketplace from which it derives economic value.

58.    CCS's trade secrets and confidential and proprietary information would give a competitor an advantage by not expending the time and resources to develop the trade secret and confidential and proprietary information as CCS has done; quickly developing products and technologies to unfairly compete with it in order to diminish its head start; alerting a competitor as to initiatives that should not be pursued; and other improper advantages.

**BONNEMA'S POST-EMPLOYMENT CONTRACTUAL OBLIGATIONS OWING TO WALGREENS**

59.    On March 3, 2011, Bonnema executed the Restrictive Covenant and Confidentiality Agreement ("Restrictive Covenant") that contains certain reasonable post-employment contractual obligations owing to Walgreens.  A true and correct copy of the Restrictive Covenant is attached as Exhibit A.

60.    In return for valuable consideration, Bonnema entered into the Restrictive Covenant.  Bonnema received, amongst other things, continued employment, incentive compensation, promotion, raises, and/or access to new CCS confidential, proprietary and/or trade secret information.  (Restrictive Covenant at p. 1.)

61.    Bonnema's Agreement defines such information that constitutes "Confidential information" as:

> [I]nformation relating to the Protected Parties financial condition, internal structure, and operations; information relating to patients, customers (including, among others, payors and drug manufacturers) referral sources, client and patient preferences, clients, suppliers and supplier preferences and needs, distributors, investors, lenders, consultants, independent contractors and employees of the Protected Parties; price lists and pricing policies; financial statements and information; budgets and projections;

business plans; production costs; market research; marketing, sales and distribution strategies; processes and business methods; technical information; pending projects and proposals; new business plans and initiatives; research and development projects; inventions, discoveries, ideas, technologies, trade secrets, know-how, formulae, designs, patterns, marks, names, improvements, industrial designs, mask works, works of authorship and other intellectual property; devices; samples; plans; specifications; photographs and digital images; computer software and programming; other confidential information and materials relating to the business of the Protected Parties; and notes, analyses, compilations, studies, summaries, reports, manuals, documents and other materials prepared by or for the Protected Parties containing or based in whole or in part on any of the foregoing (all of the foregoing, whether communicated in verbal, written, graphic, electronic or other form, or observed visually whether or not conceived, developed or prepared in whole or in part by the Employee and whether received by the Employee before or after the date hereof.

(Restrictive Covenant at § 1.)

62.     Bonnema specifically agreed that:

[T]he Confidential Information is owned or licensed to or by the Protected Parties; and is valuable, proprietary and confidential to [CCS], and that [CCS has] paid substantial consideration and incurred substantial costs to acquire or develop, sort, assemble or maintain the Confidential Information.  Employee agrees that the Confidential Information shall be treated as valuable, proprietary and confidential regardless of whether third parties would consider it valuable, proprietary and confidential.  Employee agrees that Employee will not at any time, disclose, divulge, or make known to any person or entity, use, or otherwise appropriate for Employee's own benefit or the benefit of others any Confidential Information, or permit any person to examine or make copies of any documents or electronic records that contain or are derived from Confidential Information, without the prior written consent of the President of Company.

(*Id.*)

63.     In addition to prohibiting the disclosure of CCS's confidential information, the

Agreement contains narrowly tailored post-employment restrictive covenants, which are

designed to protect its goodwill, long-standing customer relationships and employee

relationships, in addition to its confidential information.

64.     Specifically, Bonnema agreed that during the course of his employment with

CCS, and for two years after the termination of his employment for any reason, he would not:

- Engage in the Business in the Territory or market, sell or provide Products and Services in the Territory;

- Encourage, induce or attempt to induce any Employee of Protected Parties to terminate his/her employment with the Protected Parties or its Affiliates or violate any agreement with the Protected Parties or its Affiliates;

- Call upon, contact, solicit, divert, encourage or appropriate or attempt to call upon, contact, solicit, divert, encourage or appropriate any Customer, for purposes of marketing, selling, or providing Products and Services to such Customer or aiding any other Person or Representative in doing so;

- Accept as a Customer of Protected Parties, for purposes of marketing, selling or providing Products and Services to such Customer;

- Interfere with the business relationship between a Customer or, Employee of Protected Parties or its Affiliates; or

- Be or become a Representative of any Person who engages in any of the foregoing activities.

(Restrictive Covenant at § 2(B)(i)-(vi).)

65.     The Restrictive Covenant defines Bonnema's "Territory" as Boise, Idaho and the

surrounding areas, and further includes customer lists and physician lists.  (*Id.* at § 2(A)(ix).)

Additionally, the "Restricted Period" is defined as 24 months from the termination of his

employment.  (*Id.* at § 2(A)(viii).)

66.     In executing his Restrictive Covenant, Bonnema also agreed that "the terms of the

covenants are fair and reasonable and are reasonably required for the protection of the interests

of Protected Parties, their business, their officers, and their employees."  (*Id.* at § 3(A).)

67.     Bonnema further agreed that:

> [T]he covenants in this Agreement are reasonable given the highly competitive nature of the business of Protected Parties and its Affiliates and the substantial knowledge and goodwill the Employee will acquire with respect to the business of the Protected Parties and its Affiliates as result of his/her employment with the Protected Parties.  To the extent that this agreement is breached, the Protected Parties stands to lose significant revenue, profits, costs, goodwill and other tangibles and intangibles in recovering or keeping those Customers, including but not limited to current and/or former patients of the Protected Parties.

(*Id.* at § 3(B).)

68.    Additionally, Bonnema agreed that CCS and its successors and assigns, including Walgreens, would "suffer irreparable harm in the event that the Employee breaches any of the obligations under this Agreement" and that Walgreens would "be entitled to obtain from any court of competent jurisdiction preliminary and permanent injunctive relief, without the requirement of posting any bond or any other security, and expedited discovery for the purpose of seeking relief, in order to prevent or restrain any such brief."  (*Id.* at §§ 4(A) & (B).)

69.    Bonnema further agreed that if he violated any covenant, "this period shall be tolled and shall not run during any time Employee is in violation of any provision in this Agreement."  (*Id.* at § 2(B)(viii).)

70.    The Agreement contains a Tennessee choice-of-law provision (*Id.* at § 11.)

71.    Lastly, Bonnema agreed that the Agreement "shall be binding upon, and shall inure to the benefit of, Protected Parties and the Employee and their respective heirs, legal representatives, executors, administrators, successors and assigns and shall inure to the benefit of the now or hereafter existing subsidiaries and Affiliates of the Protected Parties and their respective successors and assigns."  (Agreement at § 12.)

**MATOTT'S POST-EMPLOYMENT CONTRACTUAL OBLIGATIONS OWING TO WALGREENS**

72.    On October 24, 2008, Matott entered into the Confidentiality Agreement, which contains certain reasonable post-employment contractual obligations owing to Walgreens.  A true and correct copy of the Confidentiality Agreement is attached as Exhibit B.

73.    In return for valuable consideration, Matott entered into the Confidentiality Agreement.  Matott received, amongst other things, continued employment, salaries, benefits, and/or access to CCS confidential, proprietary and/or trade secret information.  (Confidentiality Agreement at p. 1.)

74.    Matott's Confidentiality Agreement such information that constitutes "Confidential Information" as:

> All information that is proprietary and confidential to the Company, including without limitation all of Company's unpublished inventions; results of research and development; development services and advisors; wound care management protocols, processes, and algorithms; medical records; trade secrets; financial and business strategies; in, and policies; computer systems, software, hardware, firmware, and documentation; proprietary products or services; the names of and relationship with suppliers, customers, patients, referral sources, and business partners; confidential, proprietary, or trade secret information submitted to Company by suppliers, employees, consultants to or co-venturers with Company for study, evaluation, or use; and any other information not generally known to the public which, if misused or disclosed, could adversely affect the business of Company.

(Confidentiality Agreement at § 1.)

75.    Matott specifically agreed that she would only use this Confidential Information for CCS's benefit and while in its employ, keep it in the strictest confidence, and not directly or indirectly disclose the Confidential Information to a third party, including Pharmacy Solutions. (*Id.* at § 2.)

76.     In addition to prohibiting the disclosure of CCS's confidential information, the Agreement contains narrowly tailored post-employment restrictive covenants, which are designed to protect its goodwill, long-standing customer relationships and employee relationships, in addition to its confidential information.

77.     Specifically, Matott agreed that during the course of her employment with CCS and for one year after the termination of her employment for any reason, she would not:

> within a territory equal to seventy-five mile radius of my office at Company and within any geographical territory for which I was assigned responsibility at the time of my termination, (1) solicit, employ, hire, or contract for services with any employees or former employees of Company, or (2) solicit, entice, or induce any person or entity in a business relationship with the Company to enter into a business relationship with any other person or entity engaged in any activity competitive with the Company or to cease doing business with the Company.

(*Id.* at § 12.)

78.     Additionally, Matott agreed that "in the event of a breach or threatened breach of the provisions of this Agreement, Company's remedies at law will be inadequate and Company should be entitled to an injunction to enforce these provisions without a bond or other security." (*Id.* at § 13.)

79.     The Agreement contains a New Hampshire choice-of-law provision.  (*Id.* at § 15.)

80.     Lastly, Matott agreed that the Confidentiality Agreement "shall inure to the benefit of and shall be binding upon … the successors of the Company."  (*Id.*)

### THE INDIVIDUAL DEFENDANTS' DECEPTIVE POST-RESIGNATION ACTIVITIES & EMPLOYMENT WITH PHARMACY SOLUTIONS.

81.     In September 2013, CCS and Walgreens announced that Walgreens would acquire CCS in a stock purchase deal.

82.     Between September 2013 and when the deal closed on November 1, 2013, communications occurred between Walgreens and CCS outlining the situations in which CCS employees would be offered employment with Walgreens following the merger.

83.     In some instances, CCS and Walgreens each operated a specialty pharmacy within the same market space.

84.     One such place in which this occurred was the Boise/Meridian, Idaho market.

85.     As a result, on or before November 1, 2013, it was communicated to the Individual Defendants that Walgreens would not be offering them continued employment, following the wind-down of the CCS Boise, Idaho facility.

86.     On information and belief, between September 2013 and November 1, 2013, the Individual Defendants met with and were solicited by Pharmacy Solutions to join Pharmacy Solutions en masse and open a new Pharmacy Solutions location there, soliciting CCS's customers, referral sources, and utilizing CCS's confidential information.

87.     In furtherance of that scheme and on information and belief, each of the Individual Defendants misappropriated and continue to possess CCS's (and now Walgreens') confidential information and trade secrets, including Walgreens' customer lists, referral sources, pricing, pricing strategies, equipment leasing strategies, operational expenses, overhead, and other confidential information that has enabled the Defendants to unfairly compete against Walgreens in the Boise, Idaho market.

88.     In furtherance of that scheme, Bonnema and Matott both rejected severance packages from Walgreens that would have provided each with several thousands of separation pay, but also would have required each to reaffirm their non-compete and/or non-solicitation agreements.

COMPLAINT FOR EXPEDITED INJUNCTIVE AND OTHER RELIEF - 20

89.     As a result of this scheme, before and after the Individual Defendants'
employment with CCS and Walgreens ended, the Individual Defendants on behalf of Pharmacy
Solutions have improperly solicited CCS's and Walgreens' customers, causing Walgreens to lose
over $200,000 in lost sales.

90.     The Individual Defendants have and continue to disclose the identity of
Walgreens' customers.  This information is highly confidential as it is impossible to identify
users of specialty drugs, their treating physicians, their pharmacological needs, their dosages, or
their treatment schedule without access to HIPAA protected information or utilizing a specialty
pharmacy, like Walgreens' confidential and trade secret information.

91.     In all cases, each of the Walgreens' patients who left Walgreens' treatment said
they were leaving for a "smaller, local pharmacy."  However, these patients would not have been
aware of Pharmacy Solutions unless improperly solicited by the Individual Defendants as such
information is not something one can simply look up in the phone book to find.

92.     On information and belief, the Individual Defendants are each and all improperly
soliciting Walgreens' customers, disparaging Walgreens, and convincing these Walgreens'
customers to leave Walgreens for Pharmacy Solutions.

93.     In all instances, the customers who Walgreens has lost are either TPN or
immunoglobulin patients, both of which therapies are expensive therapies and highly profitable
to specialty pharmacies.

94.     On information and belief, the Defendants are systematically targeting
Walgreens' TPN and immunoglobulin patients based on this.

95.     Specifically, prior to the Individual Defendants' termination, on or before
December 18, 2013, four CCS patients announced their intent to leave and stated that they

wanted to "go with a smaller company." In all instances, each of these four patients selected Pharmacy Solutions, an unknown and new entrant into the Boise market.

96.     On or around December 18, 2013, one CCS customer, who intended to transition to Walgreens, came to CCS's office. The next day, she contacted Lu Ann Tillery, Walgreens' nurse manager, and told Ms. Tillery that after talking to the Individual Defendants, she decided she would "just go with a smaller company."

97.     Additionally, other CCS nurses were told by Mann that she was taking a job with Pharmacy Solutions and intended to take patients with her.

98.     Over the past approximately seven months, Walgreens has lost at least nine customers, whose business accounted for $48,500 per month of drug treatment.

99.     Additionally, the Individual Defendants have been coaching the former patients to inform a major insurance company that Walgreens' clinical and generally non-clinical services are lacking. These complaints from former CCS customers moving to Pharmacy Solutions are the only complaints that Walgreens has received in the past seven months in the Boise, Idaho area. Importantly, in several of the cases, the complaints that were lodged were from customers who did not even transition to Walgreens.

### EFFECT OF THE INDIVIDUAL DEFENDANTS' EMPLOYMENT WITH PHARMACY SOLUTIONS

100.    With the departure of the Individual Defendants and their knowledge of Walgreens' confidential information, Walgreens stands to lose several hundreds of thousands of dollars in business and the loss of value of its goodwill, customer relationships, trade secrets and confidential and proprietary information, which cannot be adequately addressed at law.

101.    By definition of their positions with Pharmacy Solutions, the Individual Defendants have and will continue to sell competing Pharmacy Solutions' products and services to the same customers and referral sources with who they had relationships at CCS.

102.    Pharmacy Solutions' decision to hire the Individual Defendants to run their Boise, Idaho office poses harm far beyond just significant monetary losses.

103.    Pharmacy Solutions will have an unfair advantage in targeting CCS's customers and referral sources, developing marketing plans and campaigns based on Walgreens' successes and rejected plans, and in determining what new products and services to develop or not develop. The Individual Defendants will have valuable know-how on how to design and improve Pharmacy Solutions' own products and services, customer relationships, and goodwill.

104.    The Individual Defendants cannot perform their jobs for Pharmacy Solutions without violating their Agreements and without using Walgreens' trade secrets and confidential information.

105.    All told, Defendants are causing, threatening, and/or will continue to cause or threaten significant irreparable harm to Walgreens, including the loss of value of confidential and/or proprietary information, the loss of long-standing customer relationships, loss of goodwill, as well as damage to its reputation as an industry leader and its ability to successfully market its goods and services.  Remedies at law are inadequate and cannot make Walgreens whole.

## COUNT I
## BREACH OF CONTRACT
### Against Bonnema
### (Tennessee Law)

106.    Walgreens hereby repeats, realleges, and incorporates by reference the allegations which are contained in Paragraphs 1 through 105.

COMPLAINT FOR EXPEDITED INJUNCTIVE AND OTHER RELIEF - 23

107.    The Agreement that Bonnema entered into with CCS, assigned to Walgreens through its stock purchase agreement, constitutes a valid and enforceable contract.

108.    CCS and Walgreens performed all of the duties and obligations it agreed to and owed Bonnema under his Restrictive Covenant.

109.    The post-employment activity restrictions contained in the Restrictive Covenant are reasonable in both scope and duration, and are necessary to protect Walgreens' legitimate protectable interests in its confidential business information, as well as its business relationships, goodwill and other legitimate business interests.

110.    Bonnema breached and continues to breach his post-employment contractual obligations owed to Walgreens by taking competitive employment with a Walgreens competitor.

111.    Bonnema breached and continues to breach his post-employment contractual obligations owed to Walgreens by soliciting, attempting to solicit or in any other way, attempting to influence Walgreens' customers and/or referral sources to alter or terminate their business relationship with Walgreens.

112.    Bonnema breached and continues to breach his post-employment contractual obligations owing to Walgreens by misusing its confidential and proprietary information.

113.    As a result of Bonnema's breaches of contract, Walgreens has been irreparably injured, and it continues to face irreparable injury.  It is threatened with losing the value of its confidential and proprietary information, customer relationships, as well as income and goodwill, for which a remedy at law is inadequate.

114.    Accordingly, Bonnema must be enjoined and restrained by Order of this Court. To the extent a remedy at equity is adequate, Walgreens seeks actual, incidental, compensatory, punitive and consequential damages, along with its reasonable attorneys' fees and interest.

## COUNT II
## BREACH OF CONTRACT
### Against Matott
### (New Hampshire Law)

115.    Walgreens hereby repeats, realleges, and incorporates by reference the allegations which are contained in Paragraphs 1 through 105.

116.    The Confidentiality Agreement that Matott entered into with CCS, assigned to Walgreens through its stock purchase agreement, constitutes a valid and enforceable contract.

117.    CCS and Walgreens performed all of the duties and obligations it agreed to and owed Matott under her Agreement.

118.    The post-employment activity restrictions contained in the Agreement are reasonable in both scope and duration, and are necessary to protect Walgreens' legitimate protectable interests in its confidential business information, as well as its business relationships, goodwill and other legitimate business interests.

119.    Matott breached and continues to breach her post-employment contractual obligations owed to Walgreens by soliciting, attempting to solicit or in any other way, attempting to influence Walgreens' customers and/or referral sources to alter or terminate their business relationship with Walgreens.

120.    Matott breached and continues to breach her post-employment contractual obligations owing to Walgreens by misusing its confidential and proprietary information.

121.    As a result of Matott's breaches of contract, Walgreens has been irreparably injured, and it continues to face irreparable injury.  It is threatened with losing the value of its confidential and proprietary information, customer relationships, as well as income and goodwill, for which a remedy at law is inadequate.

122.     Accordingly, Matott must be enjoined and restrained by Order of this Court.  To the extent a remedy at equity is adequate, Walgreens seeks actual, incidental, compensatory, punitive and consequential damages, along with its reasonable attorneys' fees and interest.

## COUNT III
## TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE
### (against Mann and Pharmacy Solutions)

123.     Walgreens hereby repeats, realleges, and incorporates by reference the allegations which are contained in Paragraphs 1 through 105.

124.     Walgreens specifically asserts that this tortious interference count does not involve the misappropriation of trade secret or confidential information.

125.     Walgreens has legitimate, existing and prospective economic relationships with numerous customers.

126.     Mann has knowledge of these existing customer relationships.

127.     Mann, individually and on Pharmacy Solutions' behalf, intended to harm Walgreens by interfering with Walgreens' relationships with its customers, and to unlawfully solicit Walgreens' customers to leave Walgreens and do business with Pharmacy Solutions, and also by acts of disloyalty by Mann, described above, calculated to interfere with Walgreens' relationships with customers, and its competitive advantage.

128.     Mann, individually and on Pharmacy Solutions' behalf, has unlawfully interfered and continues to interfere with Walgreens' relationships with its customers and to solicit customers to discontinue their business with Walgreens and/or to purchase from Pharmacy Solutions the same products or services that they previously purchased or are currently purchasing from CCS and Walgreens.

129.     Mann and Pharmacy Solutions' actions are without privilege or justification.

130.     As direct and proximate result of these actions, Walgreens has suffered and continues to suffer harm and is entitled to recover damages against Mann and Pharmacy Solutions.

131.     Mann's and Pharmacy Solutions' acts alleged herein were willful, wanton, malicious, and oppressive, and entitle Walgreens to an award of exemplary and punitive damages against Mann and Pharmacy Solutions.

**COUNT IV**
**ACTUAL AND/OR THREATENED MISAPPROPRIATION OF TRADE SECRETS**
**(ILLINOIS UNIFORM TRADE SECRET ACT)**
**(Against Defendants)**

132.     Walgreens hereby repeats, realleges, and incorporates by reference the allegations which are contained in Paragraphs 1 through 105.

133.     Walgreens' (and through its acquisition, CCS's) confidential and proprietary information includes, *inter alia*, Walgreens' operations, products, pricing formulae, manufacturing processes, research and development activities, analysis of competitive products, research and development efforts, marketing plans, business plans, and business strategies; and Walgreens' customers, including, but not limited to, customer lists, customer preferences, strategies for soliciting prospective customers, pricing and creative financing information, referral sources, analytical results of competitive service comparisons, customer marketing data and purchasing patterns, and planned research and development for its customer base.

134.     This information constitutes trade secrets, pursuant to the Illinois Uniform Trade Secret Act, 765 ILCS 1065/1, *et seq.*, because Walgreens derives independent economic value from this information not being generally known to the public and not being readily ascertainable by proper means by other persons who could obtain economic value from its disclosure or use, and because the information is the subject of reasonable efforts to maintain its secrecy.

135.    The Individual Defendants actually misappropriated and/or threatens to inevitably misappropriate Walgreens' trade secrets without its consent, in violation of Illinois law. Pharmacy Solutions cannot hire Walgreens' employees, including the Individual Defendants, into similar positions at Pharmacy Solutions without Defendants utilizing and disclosing Walgreens' confidential information.

136.    Defendants will be or are being unjustly enriched by the misappropriation of Walgreens' trade secrets and/or confidential information, and, unless restrained, will continue to threaten to use, actually use, divulge, inevitably disclose, acquire and/or otherwise misappropriate its trade secrets and confidential information.

137.    Defendants' actual and/or threatened misappropriation has been willful and malicious.  Further, the Individual Defendants did and continue to specifically utilize Walgreens' trade secrets, including its customers' identity, drug needs, timing of administration, physicians, and other HIPAA-protected information to the benefit of Pharmacy Solutions.

138.    As a result of the threatened and/or actual misappropriation of Walgreens' trade secrets, it has been injured and faces irreparable injury.  Walgreens is threatened with losing customers, its trade secrets and goodwill in amounts which may be impossible to determine, unless Defendants are enjoined and restrained by order of this Court.

## COUNT V
## TORTIOUS INTERFERENCE WITH CONTRACT
### (Against Pharmacy Solutions)

139.    Walgreens hereby repeats, realleges, and incorporates by reference the allegations which are contained in Paragraphs 1 through 105.

140.    As set forth above, Bonnema's Restrictive Covenant and Matott's Confidentiality Agreement are valid and enforceable contracts.  The post-employment activity covenants,

confidentiality covenants and other provisions contained in those agreements are reasonable in scope and duration and are reasonably necessary to protect Walgreens' legitimate protectable interests in its long-standing, well established and valuable customer relationships and its confidential information, as well as its goodwill.

141.    Pharmacy Solutions was fully aware of the Agreement prior to hiring and/or continuing to employ the Individual Defendants.

142.    Despite having knowledge of these agreements, Pharmacy Solutions intentionally induced, permitted or incentivized Bonnema and Matott to violate the post-employment and contractual obligations owing to Walgreens, without justification, in an effort to employ them, move Walgreens' customers and workforce, and/or unfairly compete with Walgreens.

143.    Walgreens believes Pharmacy Solutions' intentional interference was willful, malicious, unjustified and accomplished through wrongful means, including but not limited to, inducing, aiding or abetting Bonnema and Matott to breach her contract with Walgreens and otherwise violate the law.

144.    Pharmacy Solutions' interference with the Agreement is separate and apart from, and unrelated to, its threatened and/or actual misappropriation of Walgreens' trade secrets.

145.    As a result of Pharmacy Solutions' intentional interference, Walgreens has suffered irreparable and other significant injuries.

## PRAYER FOR RELIEF

WHEREFORE, Walgreens seeks judgment in its favor and an Order against Defendants that grants the following relief:

A.      Temporarily, preliminarily, and permanently enjoin Defendants Scott Bonnema, Jodi Matott, and Nancy Mann, and all parties in active concert or participation with them, from using or disclosing any of Walgreens' confidential, proprietary and/or trade secret information;

B.      Temporarily, preliminarily, and permanently enjoin Defendant Scott Bonnema from holding a position with Pharmacy Solutions in the Boise, Idaho marketplace;

C.      Temporarily, preliminarily, and permanently enjoin Defendants Scott Bonnema and Jodi Matott from directly or indirectly soliciting Walgreens and/or CCS's customers in the Boise, Idaho marketplace;

D.      Temporarily, preliminarily, and permanently enjoin Defendants Scott Bonnema, Jodi Matott, and Nancy Mann from carrying out any job function at Pharmacy Solutions or any other home infusion therapy employer in which they would have responsibility for or access to products or services competitive with Walgreens' infusion products or services as the Individual Defendants pose a threat of inevitably disclosing CCS's and Walgreens' trade secrets and confidential and proprietary information;

E.      Order Defendants and all parties in active concert or participation with them to return to Walgreens all originals and copies of all files, devices and/or documents that contain or relate to Walgreens' confidential and proprietary information, including without limitation, all computers, electronic media, PDA's and electronic storage devices;

F.      Order Defendants to produce for inspection and imaging all computers and other electronic storage devices and email accounts belonging to, under the control of, accessible to, or operated by the Individual Defendants;

G.      Awards Walgreens actual, incidental, compensatory, and consequential damages to be proven at trial;

H.     Awards Walgreens exemplary or punitive damages in an amount to be proven at trial due to Defendants' outrageous, willful and/or malicious activities;

I.      Awards Walgreens its costs and expenses incurred herein, including reasonable attorneys' fees and interest, pursuant to the Illinois Trade Secrets Act, and other applicable law;

J.      Orders Walgreens to receive all sums disgorged from the Individual Defendants; and

K.     Orders Walgreens such further relief as the Court deems necessary and just.

DATED this 21st day of July 2014.

HOLLAND & HART LLP

By   _____
     Scott E. Randolph, of the Firm
     Attorneys for Plaintiffs

6991424_1

COMPLAINT FOR EXPEDITED INJUNCTIVE AND OTHER RELIEF - 31

SCOTT BONNEMA ("Bonnema"), NANCY MANN ("Mann"), JODI MATOTT ("Matott") (collectively, the individual defendants are referred to as the "Individual Defendants"), and PHARMACY SOLUTIONS, INC. ("Pharmacy Solutions") (collectively with the Individual Defendants, hereinafter referred to as "Defendants"), state as follows:

## BRIEF NATURE OF THE ACTION

1.      This is an action for breach of contract, actual and/or threatened misappropriation of trade secrets, and tortious interference with contract as well as business expectancy. Walgreens seeks preliminary and permanent injunctive relief in addition to other relief.

2.      For the past several years, Scott Bonnema, Nancy Mann, and Jodi Matott all worked for Critical Care Systems, Inc. ("CCS"), which Walgreens acquired in a stock purchase deal in November 2013.  Each served as the pharmacy manager, nurse manager, and patient service representative, respectively.  In these positions, they managed and ran the Boise, Idaho branch for CCS, including helping establish and maintaining customer relationships with the specialty pharmacy patients for CCS in the region.  In these positions, CCS entrusted the Individual Defendants with its trade secrets and confidential information, including corporate sales and marketing strategies for the market, as well as CCS's most valued customers and the referral sources (i.e., hospitals and medical providers for patients needing home infusion therapy) through which Walgreens and CCS gained a large number of its clients.  They also helped develop and had access to CCS's confidential pricing, pricing margins, marketing strategies, product development strategies, and overall business strategies relating to CCS's Infusion business in Boise, Idaho.

3.      In September 2013, Walgreens announced plans to acquire CCS through a stock purchase deal, a deal which closed on November 1, 2013.  Through this deal, Walgreens

acquired all of CCS's specialty pharmacy business, trade secrets, and contracts, including its restrictive covenant agreements.

4.     Shortly after that announcement was made, on information and belief, Pharmacy Solutions Inc., a Wyoming corporation headquartered in Casper, Wyoming, launched plans to open a Boise, Idaho branch.  However, rather than using fair means by which to compete, its plan instead sought to pick off former CCS employees, put them into the same market in which they previously worked and—despite those employees, including Bonnema and Matott, being bound by reasonable restrictive covenants—soliciting the same former customers.

5.     Like Walgreens, Pharmacy Solutions is a home infusion therapy provider, specializing in providing specialized home infusion, pharmacy and nursing services, patient advocacy and reimbursement support, immunoglobulin therapy, antibiotics, total parenteral nutrition, and other services.  Before hiring the Individual Defendants, Pharmacy Solutions had no market presence in Boise, had no customers in Boise, and had no specialty pharmacy in Boise.

6.     On December 19, 2013, Mann resigned from CCS/Walgreens.  Bonnema's and Matott's last day with CCS/Walgreens was January 9, 2014.

7.     But, now, in its post-termination investigation, Walgreens uncovered that the Individual Defendants each, including prior to their termination of employment with Walgreens, are actively soliciting and moving Walgreens' customers to Pharmacy Solutions, utilizing Walgreens' trade secrets and in violation of certain restrictive covenant agreements.

8.     Indeed, because the identity, conditions, drug needs, therapies, treatment schedules, and physicians are protected under HIPAA and treated as confidential by any

specialty pharmacy, the Individual Defendants are clearly using and improperly disclosing such information to Pharmacy Solutions.

9.     To date, Walgreens is aware of nine customers who have already left it for Pharmacy Solutions, costing it $48,500 in sales for each month these customers continue to work with Pharmacy Solutions, and causing it in excess of $200,000 in losses already.

10.     Pharmacy Solutions now seeks to utilize Walgreens' and CCS's head start in this area and seeks to erode Walgreens' standing in the market by hiring a number of its former employees and utilizing Walgreens' information to improperly compete in the marketplace. Indeed, the knowledge and information that the Individual Defendants possess would enable Pharmacy Solutions to save hundreds of thousands of dollars in start-up costs and erode Walgreens' trade secrets, confidential and proprietary business information, customer relationships, and goodwill.  Most troubling, Pharmacy Solutions is or should be aware that Bonnema and Matott are bound by restrictive covenant agreements that would prevent their very solicitations now, but, despite this, have place each in a sales and marketing role in the infusion space that directly violates their restrictive covenants.

11.     The Individual Defendants cannot perform their duties at Pharmacy Solutions without actually and inevitably threatening to disclose Walgreens' trade secrets and confidential and proprietary information.

12.     Accordingly, Walgreens seeks to preliminarily and permanently enjoin the Individual Defendants from using or threatening to use or inevitably using Walgreens' confidential and/or trade secret information and from interfering with Walgreens' customer relationships and referral sources.  In addition, Walgreens seeks to preliminarily and permanently

enjoin Bonnema and Matott from their ongoing breach of certain reasonable post-employment contractual obligations owing to Walgreens.

13.     Absent such injunctive relief, Walgreens faces irreparable injury, including the loss of customers and referral sources, its competitive advantage, its trade secrets, and its goodwill in amounts which may be impossible to determine unless the Individual Defendants are enjoined and restrained by order of this Court.

## PARTIES

14.     Walgreen Co. is a corporation organized and existing under the laws of the State of Illinois, with its principal place of business in Deerfield, Illinois.

15.     Option Care Enterprises, Inc. is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Deerfield, Illinois.  Option Care is also known as Walgreens Specialty Infusion Pharmacy.

16.     Pharmacy Solutions, Inc. is a corporation organized and existing under the laws of the State of Wyoming, with its principal place of business in Casper, Wyoming.  Pharmacy Solutions is registered to do business in and does business in Idaho.

17.     Scott Bonnema was employed by CCS starting in September 2008 until on or around January 9, 2014.  He is domiciled in and a resident of Eagle, Idaho.

18.     Nancy Mann was employed by CCS starting in October 2012 until on or around December 19, 2013.  She is domiciled in and a resident of Meridian, Idaho.

19.     Jodi Matott was employed by CCS starting in October 2008 until on or around January 9, 2014.  She is domiciled in and a resident of Caldwell, Idaho.

## JURISDICTION AND VENUE

20.     This Court has original jurisdiction over this action under 28 U.S.C. § 1332

because the parties are citizens of different states (Walgreens Co. is an Illinois corporation,

headquartered in Illinois; Options Care Enterprises, Inc. is a Delaware corporation,

headquartered in Illinois; the Individual Defendants are all domiciled in and residents of Idaho;

and Pharmacy Solutions is a Wyoming corporation, headquartered in Wyoming) and the matter

in controversy exceeds $75,000.00 excluding interest and costs.

21.     This Court has personal jurisdiction over Defendants, and venue is proper in this

District under 28 U.S.C. § 1391(a) because all of the Defendants either reside and/or conduct

business in Idaho and within the venue of this court, and because the Defendants have committed

and continue to commit tortious acts in and/or related to this State and regularly conduct business

in Idaho.

## EVENTS GIVING RISE TO THIS ACTION

### WALGREENS' INFUSION BUSINESS

22.     Walgreens (and, before its stock purchase of CCS, CCS) is an industry leader in

infusion therapy.  Infusion therapy involves the administration of medication through a needle or

catheter to people in their homes or alternative locations.  Walgreens' infusion services include

the clinical management of drug therapies, nursing support, and care coordination.

Consequently, home infusion therapy is a comprehensive medical therapy.

23.     While typically infusion therapy involves drugs administered intravenously,

infusion therapy also includes non-oral routes, such as intramuscular injections and epidural

routes (including into the membranes surrounding the spinal cord).

24.     Infusion therapy falls into two categories, core and specialty therapies.  Core

therapies generally include antibiotic, total parenteral nutrition ("TPN"), antifungal, antiviral,

chemotherapy, hydration, inotropic heart medications, corticosteroids, and pain management. Specialty therapies generally include rare and chronic conditions, such as blood factor disorders, erythropoietin, infliximab, growth hormones, immunoglobulin, and natalizumab.

25.     Home infusion therapies were developed due to the often long-term medical needs of patients.  Generally individuals receiving specialty therapies and TPN therapies require long-term or permanent care.  Because of this, inpatient care is not preferred due to the expense, but also because it prevents individuals from resuming normal lifestyle or work activities.

26.     Moreover, because the conditions for which patients are being treated tend to be both rare and long-term, the medications which they are prescribed tend to cost thousands of dollars per month.

27.     Walgreens' Infusion Services branch pharmacies are closed-door pharmacies that specialize in providing infusion therapies to patients.  To receive such accreditation, Walgreens must satisfy licensing and other regulatory requirements imposed by state pharmacy boards as well as accreditation standards required by most third-party payers.

28.     Once a patient is discharged from the hospital, Walgreens works with patients, utilizing its local, accredited Infusion Services branch pharmacy that mixes and arranges for or administers the drugs for the patient.

29.     Because of the specialty nature of such pharmacies, they are not open to the public and generally patients learn of such pharmacies through their insurance provider or through referrals from doctors, specialty infusion or discharge nurses in the hospital, or hospitals and their administrators.

30.     Walgreens (and, before it, CCS) obtains the vast majority of its customers through these referral sources.  Typically, patients who suffer from the type of illnesses for which a home

infusion therapy is appropriate are seen by a specific set of care providers at a hospital, clinic, or practice.  Walgreens and CCS spend significant time and substantial resources in developing relationships with the doctors, nurses, and administrators who care for these types of patients and who will recommend the patient to a specialty pharmacy.

31.     Based on this, Walgreens develops a customized care plan focused on a patient's home infusion therapy needs.

32.     To properly administer these drugs, Walgreens employs an extensive array of professionals, including pharmacists, infusion nurses, as well as individuals involved in patient assessment and admission, education and training, care planning and coordination, care management by clinical infusion pharmacists, and trouble-shooting and treatment plan oversight.

33.     Walgreens further provides support to its customers through its local, multidisciplinary team of clinicians and support staff who provide: (a) 24-hour access to a clinician; (b) patient and caregiver education, training, and monitoring; (c) reimbursement assistance coordination; (d) regular communication with a patient's doctor concerning the patient's treatment; and (e) professional, friendly, and compassionate support.

34.     Walgreens measures success by efficiently producing consistent results, results that enhance confidence and improve people's lives.  Walgreens does so by ensuring that its patients' drugs are compounded in a sterile environment, maintaining the drugs in the proper environment to ensure sterility and stability, administering dosages in the proper amounts and on the proper schedule, using the appropriate access device, and monitoring for adverse reactions and therapeutic efficacy.

35.     Walgreens invests substantial time and money investing in sales representatives and management who cultivate and maintain long-term relationships with doctors, hospitals, and

other managed health organizations.  These relationships often take years to establish and are crucial to the success of its business, which relies almost entirely on referrals.

36.     Because Walgreens and CCS operates and employs both the pharmacy and the caregivers who administer the drugs, Walgreens and CCS often establish long-term, near permanent relationships with the patients who receive home infusion therapies.

37.     The home infusion industry is highly competitive, multi-billion dollar industry with only approximately 1,500 infusion pharmacy locations nationwide, compared with approximately 67,000 standard pharmacies nationwide.  One of Walgreens' newest and direct competitors is Pharmacy Solutions, a home infusion company that focuses its business in the infusion area and who opened a Boise, Idaho office this year.

## THE INDIVIDUAL DEFENDANTS' EMPLOYMENT WITH CCS & CCS'S CONFIDENTIAL INFORMATION

38.     Bonnema was employed by CCS starting in September 2008 until January 9, 2014.

39.     Matott was employed by CCS starting in October 2008 until January 9, 2014.

40.     Mann was employed by CCS starting in October 2012 until December 19, 2013.

41.     CCS is and was one of the nation's largest providers of specialty infusion services in home-based and ambulatory settings.

42.     From September 2008 until his termination in January 2014, Bonnema served as CCS's pharmacy manager for its Boise, Idaho specialty pharmacy.  In this position, Bonnema was responsible for directing high quality pharmacy services and providing medical supplies to customers and patients in accordance with established policies, procedures, and laws. Specifically, Bonnema was responsible for, amongst other things:

(a)     Directing pharmacy and operation functions to ensure effective operations;

    (b)      Preparing prescriptions, solutions, and medications accurately and promptly;

    (c)      Conducting initial and ongoing assessment of specific patient, drug and disease information to identify real and potential drug-related problems or needs;

    (d)      Monitoring quality assurance programs;

    (e)      Interfacing with physicians and referral sources;

    (f)      Serving as a drug-information resource to the sales forces and participating in team selling and sales support;

    (g)      Participating in the development of the branch budget for pharmacy operations; and

    (h)      Performing marketing support.

43.     From October 2008 until her termination in January 2014, Matott served first as a pharmacy technician and then as a Patient Service Representative for its Boise, Idaho specialty pharmacy.  In these positions, Matott was responsible for, amongst other things:

    (a)      Performing pre-delivery telephone calls to patients, nursing staff, or other agencies to monitor patient supply inventories and determining specific needs;

    (b)      Acting as a liaison between CCS and the patient;

    (c)      Generating pick lists for patient orders;

    (d)      Preparing patient information packets;

    (e)      Participating in daily meetings with pharmacy, nursing, and reimbursement;

    (f)      Performing individual delivery of patient orders and conducts in-home patient supply inventories; and

    (g)      Coordinating and performing operation activities including: (i) inventory control and monitoring inventory levels; (ii) preparation of purchase orders; (iii) placing orders with vendors; (iv) receiving incoming orders; and (v) stocking, rotating, and maintaining inventory.

44.     From October 2012 until her termination in December 2013, Mann served first as

per diem nurse and then as CCS's Nurse Manager for Boise, Idaho.  In these positions, Mann

was responsible for, amongst other things:

(a)     Providing input to annual business/marketing plans and budget for nurses
        services;

(b)     Conducting cost analyses and monitoring operating expenses for nursing
        services;

(c)     Conducting case conferences and surveys to ensure service quality for
        nursing services and participating in case conferences;

(d)     Working with functional areas to ensure coordination of client
        intake/scheduling/care plan development/resource utilization for nursing
        services and obtaining physician orders for nursing services and
        addressing resolution of client issues;

(e)     Performing nursing service roles;

(f)     Directing marketing and promotional activities for nursing services within
        the community;

(g)     Supporting company relationships with key manufacturers in providing
        consultation, in-service education, and in supporting "pull-through"
        business at the payor and local physician levels; and

(h)     Working directly with company customers and referral sources to
        establish relationships and to build customer base.

45.     In their roles, the Individual Defendants acquired intimate knowledge of and

experience with CCS's biggest referral sources and customers in the Boise, Idaho market.

46.     Moreover, in their roles, the Individual Defendants worked directly with CCS's

customers and referral sources.

47.     In particular, in their roles as Patient Services Representative and Nursing

Manager, Matott and Mann, respectively, worked extensively with CCS's customers and referral

sources.

48.     The relationships that CCS (and subsequently, Walgreens) forms with customers receiving specialty infusion drugs and services are long-standing and near permanent relationships.

49.     Accordingly, CCS (and subsequently, Walgreens) treats such customer relationships as the lifeblood of its business and treats the identities, needs, and other information relating to their referral sources and customers as highly confidential.

50.     To that end, CCS conducted regular training relating to the confidentiality of proprietary company information, which the Individual Defendants attended.

51.     Based on their roles and responsibilities, each of the Individual Defendants had direct knowledge of and access to CCS's confidential information and trade secrets relating to its Boise, Idaho operations, specifically its: (a) pricing; (b) customer retention strategies; (c) its marketing strategies; (d) intimate knowledge of CCS's customers, needs, therapies, length of therapies, and insurance that each customer utilized, and schedule for which customers needed their drugs administered; (e) intimate knowledge of CCS's referral sources, including the insurance that each referral source accepted; and (f) CCS's policies and procedures for operating and managing its Boise, Idaho specialty pharmacy and operations.

52.     Prior to Pharmacy Solutions' hire of the Individual Defendants, Pharmacy Solutions had an extremely limited presence in the state of Idaho and had no customers or patients, no referral sources, and no specialty pharmacy, whatsoever, in Boise, Idaho.

53.     Additionally, given their positions, the Individual Defendants had access to and developed CCS's confidential information about CCS's infusion customers, what products they purchased, when such products were purchased, and pricing information relating to those customers.

54.     Moreover, the Individual Defendants had access to and knew the hospitals and physicians who are writing prescriptions for home infusion, the therapies, length of therapies, and insurance that each referral source accepts, and the turnaround time between when a new patient is brought on board and when drugs are administered.

55.     CCS's confidential information (now Walgreens' based on the stock purchase of CCS) discussed above is not available to the public, is of great value to it and would give any of its competitors who acquired such information, including Pharmacy Solutions, an unfair competitive advantage.

56.     CCS requires that its information be kept strictly confidential by its employees and restricts access to this information.  CCS takes specific and rigorous measures to preserve the confidentiality of this information, including but not limited to, the following:

     (a)     requiring employees to sign confidentiality agreements containing covenants designed to maintain confidentiality and to return its property upon termination;

     (b)     requiring its employees to maintain confidentiality of its information and protect its assets;

     (c)     prohibiting the use of its materials not directly related to its business, or the removal or borrowing of its property without permission;

     (d)     using a lock and key to restrict access to and within its facilities to which the Individual Defendants had access;

     (e)     prohibiting the use of its computer systems for non-company purposes;

     (f)     restricting access to its computerized information through the use of passwords;

     (g)     prohibiting the unauthorized physical removal of company information (via paper, disc, flash drive or other media) and electronic transmission of such information (via email or other means); and

     (h)     also restricting access to its computerized company information based on each individual employee's "need to know" the particular information.

57.     CCS rigorously maintains the confidentiality of its information because the information provides it a competitive advantage in the marketplace from which it derives economic value.

58.     CCS's trade secrets and confidential and proprietary information would give a competitor an advantage by not expending the time and resources to develop the trade secret and confidential and proprietary information as CCS has done; quickly developing products and technologies to unfairly compete with it in order to diminish its head start; alerting a competitor as to initiatives that should not be pursued; and other improper advantages.

### BONNEMA'S POST-EMPLOYMENT CONTRACTUAL OBLIGATIONS OWING TO WALGREENS

59.     On March 3, 2011, Bonnema executed the Restrictive Covenant and Confidentiality Agreement ("Restrictive Covenant") that contains certain reasonable post-employment contractual obligations owing to Walgreens.  A true and correct copy of the Restrictive Covenant is attached as Exhibit A.

60.     In return for valuable consideration, Bonnema entered into the Restrictive Covenant.  Bonnema received, amongst other things, continued employment, incentive compensation, promotion, raises, and/or access to new CCS confidential, proprietary and/or trade secret information.  (Restrictive Covenant at p. 1.)

61.     Bonnema's Agreement defines such information that constitutes "Confidential information" as:

> [I]nformation relating to the Protected Parties financial condition, internal structure, and operations; information relating to patients, customers (including, among others, payors and drug manufacturers) referral sources, client and patient preferences, clients, suppliers and supplier preferences and needs, distributors, investors, lenders, consultants, independent contractors and employees of the Protected Parties; price lists and pricing policies; financial statements and information; budgets and projections;

COMPLAINT FOR EXPEDITED INJUNCTIVE AND OTHER RELIEF - 14

business plans; production costs; market research; marketing, sales and distribution strategies; processes and business methods; technical information; pending projects and proposals; new business plans and initiatives; research and development projects; inventions, discoveries, ideas, technologies, trade secrets, know-how, formulae, designs, patterns, marks, names, improvements, industrial designs, mask works, works of authorship and other intellectual property; devices; samples; plans; specifications; photographs and digital images; computer software and programming; other confidential information and materials relating to the business of the Protected Parties; and notes, analyses, compilations, studies, summaries, reports, manuals, documents and other materials prepared by or for the Protected Parties containing or based in whole or in part on any of the foregoing (all of the foregoing, whether communicated in verbal, written, graphic, electronic or other form, or observed visually whether or not conceived, developed or prepared in whole or in part by the Employee and whether received by the Employee before or after the date hereof.

(Restrictive Covenant at § 1.)

62.     Bonnema specifically agreed that:

[T]he Confidential Information is owned or licensed to or by the Protected Parties; and is valuable, proprietary and confidential to [CCS], and that [CCS has] paid substantial consideration and incurred substantial costs to acquire or develop, sort, assemble or maintain the Confidential Information.  Employee agrees that the Confidential Information shall be treated as valuable, proprietary and confidential regardless of whether third parties would consider it valuable, proprietary and confidential.  Employee agrees that Employee will not at any time, disclose, divulge, or make known to any person or entity, use, or otherwise appropriate for Employee's own benefit or the benefit of others any Confidential Information, or permit any person to examine or make copies of any documents or electronic records that contain or are derived from Confidential Information, without the prior written consent of the President of Company.

(*Id.*)

63.     In addition to prohibiting the disclosure of CCS's confidential information, the

Agreement contains narrowly tailored post-employment restrictive covenants, which are

COMPLAINT FOR EXPEDITED INJUNCTIVE AND OTHER RELIEF - 15

designed to protect its goodwill, long-standing customer relationships and employee

relationships, in addition to its confidential information.

64.     Specifically, Bonnema agreed that during the course of his employment with

CCS, and for two years after the termination of his employment for any reason, he would not:

- Engage in the Business in the Territory or market, sell or provide Products and Services in the Territory;

- Encourage, induce or attempt to induce any Employee of Protected Parties to terminate his/her employment with the Protected Parties or its Affiliates or violate any agreement with the Protected Parties or its Affiliates;

- Call upon, contact, solicit, divert, encourage or appropriate or attempt to call upon, contact, solicit, divert, encourage or appropriate any Customer, for purposes of marketing, selling, or providing Products and Services to such Customer or aiding any other Person or Representative in doing so;

- Accept as a Customer of Protected Parties, for purposes of marketing, selling or providing Products and Services to such Customer;

- Interfere with the business relationship between a Customer or, Employee of Protected Parties or its Affiliates; or

- Be or become a Representative of any Person who engages in any of the foregoing activities.

(Restrictive Covenant at § 2(B)(i)-(vi).)

65.     The Restrictive Covenant defines Bonnema's "Territory" as Boise, Idaho and the

surrounding areas, and further includes customer lists and physician lists.  (*Id.* at § 2(A)(ix).)

Additionally, the "Restricted Period" is defined as 24 months from the termination of his

employment.  (*Id.* at § 2(A)(viii).)

66.     In executing his Restrictive Covenant, Bonnema also agreed that "the terms of the

covenants are fair and reasonable and are reasonably required for the protection of the interests

of Protected Parties, their business, their officers, and their employees."  (*Id.* at § 3(A).)

67.     Bonnema further agreed that:

> [T]he covenants in this Agreement are reasonable given the highly competitive nature of the business of Protected Parties and its Affiliates and the substantial knowledge and goodwill the Employee will acquire with respect to the business of the Protected Parties and its Affiliates as result of his/her employment with the Protected Parties.  To the extent that this agreement is breached, the Protected Parties stands to lose significant revenue, profits, costs, goodwill and other tangibles and intangibles in recovering or keeping those Customers, including but not limited to current and/or former patients of the Protected Parties.

(*Id.* at § 3(B).)

68.    Additionally, Bonnema agreed that CCS and its successors and assigns, including Walgreens, would "suffer irreparable harm in the event that the Employee breaches any of the obligations under this Agreement" and that Walgreens would "be entitled to obtain from any court of competent jurisdiction preliminary and permanent injunctive relief, without the requirement of posting any bond or any other security, and expedited discovery for the purpose of seeking relief, in order to prevent or restrain any such brief."  (*Id.* at §§ 4(A) & (B).)

69.    Bonnema further agreed that if he violated any covenant, "this period shall be tolled and shall not run during any time Employee is in violation of any provision in this Agreement."  (*Id.* at § 2(B)(viii).)

70.    The Agreement contains a Tennessee choice-of-law provision (*Id.* at § 11.)

71.    Lastly, Bonnema agreed that the Agreement "shall be binding upon, and shall inure to the benefit of, Protected Parties and the Employee and their respective heirs, legal representatives, executors, administrators, successors and assigns and shall inure to the benefit of the now or hereafter existing subsidiaries and Affiliates of the Protected Parties and their respective successors and assigns."  (Agreement at § 12.)

COMPLAINT FOR EXPEDITED INJUNCTIVE AND OTHER RELIEF - 17

**MATOTT'S POST-EMPLOYMENT CONTRACTUAL OBLIGATIONS OWING TO WALGREENS**

72.     On October 24, 2008, Matott entered into the Confidentiality Agreement, which contains certain reasonable post-employment contractual obligations owing to Walgreens.  A true and correct copy of the Confidentiality Agreement is attached as Exhibit B.

73.     In return for valuable consideration, Matott entered into the Confidentiality Agreement.  Matott received, amongst other things, continued employment, salaries, benefits, and/or access to CCS confidential, proprietary and/or trade secret information.  (Confidentiality Agreement at p. 1.)

74.     Matott's Confidentiality Agreement such information that constitutes "Confidential Information" as:

> All information that is proprietary and confidential to the Company, including without limitation all of Company's unpublished inventions; results of research and development; development services and advisors; wound care management protocols, processes, and algorithms; medical records; trade secrets; financial and business strategies; in, and policies; computer systems, software, hardware, firmware, and documentation; proprietary products or services; the names of and relationship with suppliers, customers, patients, referral sources, and business partners; confidential, proprietary, or trade secret information submitted to Company by suppliers, employees, consultants to or co-venturers with Company for study, evaluation, or use; and any other information not generally known to the public which, if misused or disclosed, could adversely affect the business of Company.

(Confidentiality Agreement at § 1.)

75.     Matott specifically agreed that she would only use this Confidential Information for CCS's benefit and while in its employ, keep it in the strictest confidence, and not directly or indirectly disclose the Confidential Information to a third party, including Pharmacy Solutions. (*Id.* at § 2.)

76.     In addition to prohibiting the disclosure of CCS's confidential information, the

Agreement contains narrowly tailored post-employment restrictive covenants, which are

designed to protect its goodwill, long-standing customer relationships and employee

relationships, in addition to its confidential information.

77.     Specifically, Matott agreed that during the course of her employment with CCS

and for one year after the termination of her employment for any reason, she would not:

> within a territory equal to seventy-five mile radius of my office at
> Company and within any geographical territory for which I was
> assigned responsibility at the time of my termination, (1) solicit,
> employ, hire, or contract for services with any employees or
> former employees of Company, or (2) solicit, entice, or induce any
> person or entity in a business relationship with the Company to
> enter into a business relationship with any other person or entity
> engaged in any activity competitive with the Company or to cease
> doing business with the Company.

(*Id.* at § 12.)

78.     Additionally, Matott agreed that "in the event of a breach or threatened breach of

the provisions of this Agreement, Company's remedies at law will be inadequate and Company

should be entitled to an injunction to enforce these provisions without a bond or other security."

(*Id.* at § 13.)

79.     The Agreement contains a New Hampshire choice-of-law provision.  (*Id.* at § 15.)

80.     Lastly, Matott agreed that the Confidentiality Agreement "shall inure to the

benefit of and shall be binding upon … the successors of the Company."  (*Id.*)

### THE INDIVIDUAL DEFENDANTS' DECEPTIVE POST-RESIGNATION ACTIVITIES & EMPLOYMENT WITH PHARMACY SOLUTIONS.

81.     In September 2013, CCS and Walgreens announced that Walgreens would

acquire CCS in a stock purchase deal.

82.     Between September 2013 and when the deal closed on November 1, 2013, communications occurred between Walgreens and CCS outlining the situations in which CCS employees would be offered employment with Walgreens following the merger.

83.     In some instances, CCS and Walgreens each operated a specialty pharmacy within the same market space.

84.     One such place in which this occurred was the Boise/Meridian, Idaho market.

85.     As a result, on or before November 1, 2013, it was communicated to the Individual Defendants that Walgreens would not be offering them continued employment, following the wind-down of the CCS Boise, Idaho facility.

86.     On information and belief, between September 2013 and November 1, 2013, the Individual Defendants met with and were solicited by Pharmacy Solutions to join Pharmacy Solutions en masse and open a new Pharmacy Solutions location there, soliciting CCS's customers, referral sources, and utilizing CCS's confidential information.

87.     In furtherance of that scheme and on information and belief, each of the Individual Defendants misappropriated and continue to possess CCS's (and now Walgreens') confidential information and trade secrets, including Walgreens' customer lists, referral sources, pricing, pricing strategies, equipment leasing strategies, operational expenses, overhead, and other confidential information that has enabled the Defendants to unfairly compete against Walgreens in the Boise, Idaho market.

88.     In furtherance of that scheme, Bonnema and Matott both rejected severance packages from Walgreens that would have provided each with several thousands of separation pay, but also would have required each to reaffirm their non-compete and/or non-solicitation agreements.

COMPLAINT FOR EXPEDITED INJUNCTIVE AND OTHER RELIEF - 20

89.     As a result of this scheme, before and after the Individual Defendants'
employment with CCS and Walgreens ended, the Individual Defendants on behalf of Pharmacy
Solutions have improperly solicited CCS's and Walgreens' customers, causing Walgreens to lose
over $200,000 in lost sales.

90.     The Individual Defendants have and continue to disclose the identity of
Walgreens' customers.  This information is highly confidential as it is impossible to identify
users of specialty drugs, their treating physicians, their pharmacological needs, their dosages, or
their treatment schedule without access to HIPAA protected information or utilizing a specialty
pharmacy, like Walgreens' confidential and trade secret information.

91.     In all cases, each of the Walgreens' patients who left Walgreens' treatment said
they were leaving for a "smaller, local pharmacy."  However, these patients would not have been
aware of Pharmacy Solutions unless improperly solicited by the Individual Defendants as such
information is not something one can simply look up in the phone book to find.

92.     On information and belief, the Individual Defendants are each and all improperly
soliciting Walgreens' customers, disparaging Walgreens, and convincing these Walgreens'
customers to leave Walgreens for Pharmacy Solutions.

93.     In all instances, the customers who Walgreens has lost are either TPN or
immunoglobulin patients, both of which therapies are expensive therapies and highly profitable
to specialty pharmacies.

94.     On information and belief, the Defendants are systematically targeting
Walgreens' TPN and immunoglobulin patients based on this.

95.     Specifically, prior to the Individual Defendants' termination, on or before
December 18, 2013, four CCS patients announced their intent to leave and stated that they

wanted to "go with a smaller company."  In all instances, each of these four patients selected Pharmacy Solutions, an unknown and new entrant into the Boise market.

96.     On or around December 18, 2013, one CCS customer, who intended to transition to Walgreens, came to CCS's office.  The next day, she contacted Lu Ann Tillery, Walgreens' nurse manager, and told Ms. Tillery that after talking to the Individual Defendants, she decided she would "just go with a smaller company."

97.     Additionally, other CCS nurses were told by Mann that she was taking a job with Pharmacy Solutions and intended to take patients with her.

98.     Over the past approximately seven months, Walgreens has lost at least nine customers, whose business accounted for $48,500 per month of drug treatment.

99.     Additionally, the Individual Defendants have been coaching the former patients to inform a major insurance company that Walgreens' clinical and generally non-clinical services are lacking.  These complaints from former CCS customers moving to Pharmacy Solutions are the only complaints that Walgreens has received in the past seven months in the Boise, Idaho area.  Importantly, in several of the cases, the complaints that were lodged were from customers who did not even transition to Walgreens.

### EFFECT OF THE INDIVIDUAL DEFENDANTS' EMPLOYMENT WITH PHARMACY SOLUTIONS

100.     With the departure of the Individual Defendants and their knowledge of Walgreens' confidential information, Walgreens stands to lose several hundreds of thousands of dollars in business and the loss of value of its goodwill, customer relationships, trade secrets and confidential and proprietary information, which cannot be adequately addressed at law.

101.    By definition of their positions with Pharmacy Solutions, the Individual Defendants have and will continue to sell competing Pharmacy Solutions' products and services to the same customers and referral sources with who they had relationships at CCS.

102.    Pharmacy Solutions' decision to hire the Individual Defendants to run their Boise, Idaho office poses harm far beyond just significant monetary losses.

103.    Pharmacy Solutions will have an unfair advantage in targeting CCS's customers and referral sources, developing marketing plans and campaigns based on Walgreens' successes and rejected plans, and in determining what new products and services to develop or not develop. The Individual Defendants will have valuable know-how on how to design and improve Pharmacy Solutions' own products and services, customer relationships, and goodwill.

104.    The Individual Defendants cannot perform their jobs for Pharmacy Solutions without violating their Agreements and without using Walgreens' trade secrets and confidential information.

105.    All told, Defendants are causing, threatening, and/or will continue to cause or threaten significant irreparable harm to Walgreens, including the loss of value of confidential and/or proprietary information, the loss of long-standing customer relationships, loss of goodwill, as well as damage to its reputation as an industry leader and its ability to successfully market its goods and services.  Remedies at law are inadequate and cannot make Walgreens whole.

**COUNT I**
**BREACH OF CONTRACT**
**Against Bonnema**
**(Tennessee Law)**

106.    Walgreens hereby repeats, realleges, and incorporates by reference the allegations which are contained in Paragraphs 1 through 105.

COMPLAINT FOR EXPEDITED INJUNCTIVE AND OTHER RELIEF - 23

107.    The Agreement that Bonnema entered into with CCS, assigned to Walgreens through its stock purchase agreement, constitutes a valid and enforceable contract.

108.    CCS and Walgreens performed all of the duties and obligations it agreed to and owed Bonnema under his Restrictive Covenant.

109.    The post-employment activity restrictions contained in the Restrictive Covenant are reasonable in both scope and duration, and are necessary to protect Walgreens' legitimate protectable interests in its confidential business information, as well as its business relationships, goodwill and other legitimate business interests.

110.    Bonnema breached and continues to breach his post-employment contractual obligations owed to Walgreens by taking competitive employment with a Walgreens competitor.

111.    Bonnema breached and continues to breach his post-employment contractual obligations owed to Walgreens by soliciting, attempting to solicit or in any other way, attempting to influence Walgreens' customers and/or referral sources to alter or terminate their business relationship with Walgreens.

112.    Bonnema breached and continues to breach his post-employment contractual obligations owing to Walgreens by misusing its confidential and proprietary information.

113.    As a result of Bonnema's breaches of contract, Walgreens has been irreparably injured, and it continues to face irreparable injury.  It is threatened with losing the value of its confidential and proprietary information, customer relationships, as well as income and goodwill, for which a remedy at law is inadequate.

114.    Accordingly, Bonnema must be enjoined and restrained by Order of this Court. To the extent a remedy at equity is adequate, Walgreens seeks actual, incidental, compensatory, punitive and consequential damages, along with its reasonable attorneys' fees and interest.

## COUNT II
## BREACH OF CONTRACT
### Against Matott
### (New Hampshire Law)

115.     Walgreens hereby repeats, realleges, and incorporates by reference the allegations which are contained in Paragraphs 1 through 105.

116.     The Confidentiality Agreement that Matott entered into with CCS, assigned to Walgreens through its stock purchase agreement, constitutes a valid and enforceable contract.

117.     CCS and Walgreens performed all of the duties and obligations it agreed to and owed Matott under her Agreement.

118.     The post-employment activity restrictions contained in the Agreement are reasonable in both scope and duration, and are necessary to protect Walgreens' legitimate protectable interests in its confidential business information, as well as its business relationships, goodwill and other legitimate business interests.

119.     Matott breached and continues to breach her post-employment contractual obligations owed to Walgreens by soliciting, attempting to solicit or in any other way, attempting to influence Walgreens' customers and/or referral sources to alter or terminate their business relationship with Walgreens.

120.     Matott breached and continues to breach her post-employment contractual obligations owing to Walgreens by misusing its confidential and proprietary information.

121.     As a result of Matott's breaches of contract, Walgreens has been irreparably injured, and it continues to face irreparable injury.  It is threatened with losing the value of its confidential and proprietary information, customer relationships, as well as income and goodwill, for which a remedy at law is inadequate.

122.    Accordingly, Matott must be enjoined and restrained by Order of this Court.  To the extent a remedy at equity is adequate, Walgreens seeks actual, incidental, compensatory, punitive and consequential damages, along with its reasonable attorneys' fees and interest.

## COUNT III
## TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE
### (against Mann and Pharmacy Solutions)

123.    Walgreens hereby repeats, realleges, and incorporates by reference the allegations which are contained in Paragraphs 1 through 105.

124.    Walgreens specifically asserts that this tortious interference count does not involve the misappropriation of trade secret or confidential information.

125.    Walgreens has legitimate, existing and prospective economic relationships with numerous customers.

126.    Mann has knowledge of these existing customer relationships.

127.    Mann, individually and on Pharmacy Solutions' behalf, intended to harm Walgreens by interfering with Walgreens' relationships with its customers, and to unlawfully solicit Walgreens' customers to leave Walgreens and do business with Pharmacy Solutions, and also by acts of disloyalty by Mann, described above, calculated to interfere with Walgreens' relationships with customers, and its competitive advantage.

128.    Mann, individually and on Pharmacy Solutions' behalf, has unlawfully interfered and continues to interfere with Walgreens' relationships with its customers and to solicit customers to discontinue their business with Walgreens and/or to purchase from Pharmacy Solutions the same products or services that they previously purchased or are currently purchasing from CCS and Walgreens.

129.    Mann and Pharmacy Solutions' actions are without privilege or justification.

130.     As direct and proximate result of these actions, Walgreens has suffered and continues to suffer harm and is entitled to recover damages against Mann and Pharmacy Solutions.

131.     Mann's and Pharmacy Solutions' acts alleged herein were willful, wanton, malicious, and oppressive, and entitle Walgreens to an award of exemplary and punitive damages against Mann and Pharmacy Solutions.

**COUNT IV**
**ACTUAL AND/OR THREATENED MISAPPROPRIATION OF TRADE SECRETS**
**(ILLINOIS UNIFORM TRADE SECRET ACT)**
**(Against Defendants)**

132.     Walgreens hereby repeats, realleges, and incorporates by reference the allegations which are contained in Paragraphs 1 through 105.

133.     Walgreens' (and through its acquisition, CCS's) confidential and proprietary information includes, *inter alia*, Walgreens' operations, products, pricing formulae, manufacturing processes, research and development activities, analysis of competitive products, research and development efforts, marketing plans, business plans, and business strategies; and Walgreens' customers, including, but not limited to, customer lists, customer preferences, strategies for soliciting prospective customers, pricing and creative financing information, referral sources, analytical results of competitive service comparisons, customer marketing data and purchasing patterns, and planned research and development for its customer base.

134.     This information constitutes trade secrets, pursuant to the Illinois Uniform Trade Secret Act, 765 ILCS 1065/1, *et seq.*, because Walgreens derives independent economic value from this information not being generally known to the public and not being readily ascertainable by proper means by other persons who could obtain economic value from its disclosure or use, and because the information is the subject of reasonable efforts to maintain its secrecy.

135.    The Individual Defendants actually misappropriated and/or threatens to inevitably misappropriate Walgreens' trade secrets without its consent, in violation of Illinois law. Pharmacy Solutions cannot hire Walgreens' employees, including the Individual Defendants, into similar positions at Pharmacy Solutions without Defendants utilizing and disclosing Walgreens' confidential information.

136.    Defendants will be or are being unjustly enriched by the misappropriation of Walgreens' trade secrets and/or confidential information, and, unless restrained, will continue to threaten to use, actually use, divulge, inevitably disclose, acquire and/or otherwise misappropriate its trade secrets and confidential information.

137.    Defendants' actual and/or threatened misappropriation has been willful and malicious.  Further, the Individual Defendants did and continue to specifically utilize Walgreens' trade secrets, including its customers' identity, drug needs, timing of administration, physicians, and other HIPAA-protected information to the benefit of Pharmacy Solutions.

138.    As a result of the threatened and/or actual misappropriation of Walgreens' trade secrets, it has been injured and faces irreparable injury.  Walgreens is threatened with losing customers, its trade secrets and goodwill in amounts which may be impossible to determine, unless Defendants are enjoined and restrained by order of this Court.

### COUNT V
### TORTIOUS INTERFERENCE WITH CONTRACT
### (Against Pharmacy Solutions)

139.    Walgreens hereby repeats, realleges, and incorporates by reference the allegations which are contained in Paragraphs 1 through 105.

140.    As set forth above, Bonnema's Restrictive Covenant and Matott's Confidentiality Agreement are valid and enforceable contracts.  The post-employment activity covenants,

confidentiality covenants and other provisions contained in those agreements are reasonable in scope and duration and are reasonably necessary to protect Walgreens' legitimate protectable interests in its long-standing, well established and valuable customer relationships and its confidential information, as well as its goodwill.

141.    Pharmacy Solutions was fully aware of the Agreement prior to hiring and/or continuing to employ the Individual Defendants.

142.    Despite having knowledge of these agreements, Pharmacy Solutions intentionally induced, permitted or incentivized Bonnema and Matott to violate the post-employment and contractual obligations owing to Walgreens, without justification, in an effort to employ them, move Walgreens' customers and workforce, and/or unfairly compete with Walgreens.

143.    Walgreens believes Pharmacy Solutions' intentional interference was willful, malicious, unjustified and accomplished through wrongful means, including but not limited to, inducing, aiding or abetting Bonnema and Matott to breach her contract with Walgreens and otherwise violate the law.

144.    Pharmacy Solutions' interference with the Agreement is separate and apart from, and unrelated to, its threatened and/or actual misappropriation of Walgreens' trade secrets.

145.    As a result of Pharmacy Solutions' intentional interference, Walgreens has suffered irreparable and other significant injuries.

## PRAYER FOR RELIEF

WHEREFORE, Walgreens seeks judgment in its favor and an Order against Defendants that grants the following relief:

A.      Temporarily, preliminarily, and permanently enjoin Defendants Scott Bonnema, Jodi Matott, and Nancy Mann, and all parties in active concert or participation with them, from using or disclosing any of Walgreens' confidential, proprietary and/or trade secret information;

B.      Temporarily, preliminarily, and permanently enjoin Defendant Scott Bonnema from holding a position with Pharmacy Solutions in the Boise, Idaho marketplace;

C.      Temporarily, preliminarily, and permanently enjoin Defendants Scott Bonnema and Jodi Matott from directly or indirectly soliciting Walgreens and/or CCS's customers in the Boise, Idaho marketplace;

D.      Temporarily, preliminarily, and permanently enjoin Defendants Scott Bonnema, Jodi Matott, and Nancy Mann from carrying out any job function at Pharmacy Solutions or any other home infusion therapy employer in which they would have responsibility for or access to products or services competitive with Walgreens' infusion products or services as the Individual Defendants pose a threat of inevitably disclosing CCS's and Walgreens' trade secrets and confidential and proprietary information;

E.      Order Defendants and all parties in active concert or participation with them to return to Walgreens all originals and copies of all files, devices and/or documents that contain or relate to Walgreens' confidential and proprietary information, including without limitation, all computers, electronic media, PDA's and electronic storage devices;

F.      Order Defendants to produce for inspection and imaging all computers and other electronic storage devices and email accounts belonging to, under the control of, accessible to, or operated by the Individual Defendants;

G.      Awards Walgreens actual, incidental, compensatory, and consequential damages to be proven at trial;

H.      Awards Walgreens exemplary or punitive damages in an amount to be proven at trial due to Defendants' outrageous, willful and/or malicious activities;

I.      Awards Walgreens its costs and expenses incurred herein, including reasonable attorneys' fees and interest, pursuant to the Illinois Trade Secrets Act, and other applicable law;

J.      Orders Walgreens to receive all sums disgorged from the Individual Defendants; and

K.      Orders Walgreens such further relief as the Court deems necessary and just.

DATED this 21st day of July 2014.

HOLLAND & HART LLP


By      _____*s/ Scott E. Randolph*_____
        Scott E. Randolph, of the Firm
        Attorneys for Plaintiffs

6991424_1

# EXHIBIT A

*CCS*

*Bonnema, Scott*

## Restrictive Covenant
## and Confidentiality Agreement

This Agreement is made and entered into this 4th day of *March*, 2001 by and between Accredo Health, Incorporated, and the employee who has executed this Agreement on the last page hereof ("Employee"). As used herein, "Protected Parties" shall mean Accredo Health, Incorporated, Medco Health Solutions, Inc., Accredo Health Group, Inc,, Clinical Business Solutions, Inc., BioPartners In Care, Inc., Accredo Health Services (Infusion), Inc,, AHG of New York, Inc., CCS Infusion Management, LLC; Critical Care Systems, Inc.; Critical Care Systems of New York, Inc.; Infinity Infusion Care, LTD; HCS, Inc.; and CCS America, Inc. and any affiliate(s) thereof.

## W I T N E S S E T H :

WHEREAS, on the date hereof Employee has been employed by one of the Protected Parties or one of the Protected Parties has offered a promotion to Employee or the Employee is receiving the grant of stock options in Medco Health Solutions, Inc., stock pursuant to an Accredo Health, Incorporated Stock Plan or the Medco Health Solutions, Inc., stock plan and the execution and delivery by Employee of this Agreement is a condition to such employment or promotion or the grant of stock options.

In exchange of the mutual promises contained herein and for other good and valuable considerations, the receipt and sufficiency of which are hereby acknowledged, Protected Parties acting for itself and on behalf of all of the Protected Parties, and Employee agree as follows:

l.   The Employee acknowledges that as a result of his/her employment with the one of the Protected Parties, the Employee has or will receive access to confidential information of the Protected Parties including but not limited to, information related to the Protected Parties financial condition, internal structure, and operations; information relating to patients, customers (including, among others, payors and drug manufacturers) referral sources, client and patient preferences, clients, suppliers and supplier preferences and needs, distributors, investors, lenders, consultants, independent contractors and employees of the Protected Parties; price lists and pricing policies; financial statements and information; budgets and projections; business plans; production costs; market research; marketing, sales and distribution strategies; processes and business methods; technical information; pending projects and proposals; new business plans and initiatives; research and development projects; inventions, discoveries, ideas, technologies, trade secrets, know-how, formulae, designs, patterns, marks, names, improvements, industrial designs, mask works, works of authorship and other intellectual property; devices; samples; plans; specifications; photographs and digital images; computer software and programming; other confidential information and materials relating to the business of the Protected Parties; and notes, analyses, compilations, studies, summaries, reports, manuals, documents and other materials prepared by or for the Protected Parties containing or based in whole or in part on any of the foregoing (all of the foregoing, whether communicated in verbal, written, graphic, electronic or any other form, or observed visually whether or not conceived, developed or prepared in whole or in part by the Employee and whether received by the Employee before or after the date hereof, (collectively, "Confidential Information").

Employee acknowledges that the Confidential Information is owned or licensed to or by the Protected Parties; and is valuable, proprietary and confidential to Protected Parties, and that Protected Parties have paid substantial consideration and incurred substantial costs to acquire or develop, sort, assemble or maintain the Confidential Information. Employee agrees that the Confidential Information shall be treated as valuable, proprietary and confidential regardless of whether third parties would consider it valuable, proprietary and confidential. Employee agrees that Employee will not at any time, disclose, divulge, or make known to any person or entity, use, or otherwise appropriate for Employee's own benefit or the benefit of others any Confidential Information, or permit any person to examine or make copies of any documents or electronic records that contain or are derived from Confidential

91606 Modified 0209

Information, without the prior written consent of the President of Protected Parties. The Employee hereby relinquishes, and agrees that he/she does not and will not at any time claim, any right, title or interest of any kind in or to any Confidential Information.

Upon the termination of the Employee's employment with the Protected Parties for any reason, the Employee will surrender, turn over and return to the Protected Parties all Confidential Information in any form (including all copies and reproductions thereof) and all other Protected Parties property whatsoever in or under his/her possession or control, including computer records and mailing lists, in whatever nature or form, whether originals or copies; and Employee will not retain Confidential Information in any manner or form. Any compensation due the Employee at the time of such termination may be withheld pending receipt of such items.

Notwithstanding the preceding restrictions, Employee may use Confidential Information following reasonable prior notice to Protected Parties to provide any mandatory responses to governmental inquiries. The obligations under this Section are in addition to and not in lieu of any other rights or obligations, at law or in equity, to maintain the confidentiality of the Confidential Information, including under applicable "trade secret" laws. Confidential Information shall not be deemed to include information which is or becomes generally available to the public other than as a result of an impermissible disclosure hereunder by Employee or any other party with a duty not to disclose.

2.   Restrictive Covenant.

A. As used in this Agreement, the following terms have the following meanings:

(i) "Affiliate" of a Person means any Person that, directly or indirectly, through one or more intermediaries or otherwise, controls, is controlled by, or is under common control with such Person, where "control" means the ability or direct management or polices through the ownership of voting securities, by contract or otherwise.

(ii) "Business" means the business(es) in which the Protected Parties or its Affiliates are or were engaged in at the time of, or during the 24 month period prior to, the termination of the Employee's employment with the Protected Parties for any reason.

(iii) "Customer" means any Person who is or was, in any manner, a customer including, among others, a payor, drug manufacturer, supplier, referral source, patient or client of the Protected Parties or its Affiliates  (i) at the time of, or prior to, the termination of the Employee's employment with the Protected Parties for any reason, or (ii) at the time of, or prior to, the termination of the Employee's employment with the Protected Parties for any reason and with whom the Employee had dealings in the course of his employment with the Protected Parties or about whom Employee learned in the course of the Employee's employment with the Protected Parties.

(iv) "Protected Parties Employee" means any Person who is or was an employee of the Protected Parties or its Affiliates at the time of, or during the 24 month period prior to, the termination of the Employee's employment with the Protected Parties for any reason.

(v) "Person" means any individual, corporation, limited liability company, partnership, company, sole proprietorship, joint venture, trust, estate, association, organization, labor union, governmental body, or other entity.

(vi) "Products and Services" means (i) specialty pharmacy, mail-order, retail or prescription drug benefit (including Pharmacy Benefit Management "PBM") services, home infusion therapy, the provision of hemophilia clotting factors and related services, the sales and marketing of intravenous immune globulin therapy at home or in a physicians office, the management of infusion therapy suite or program on behalf of physicians or the healthcare providers, the sales of fertility or oncology

medications, the sale of blood products; and (ii) the products and/or services offered by the Protected Parties or its Affiliates at the time of, or during the 24 month period prior to, termination of the Employee's employment with the Protected Parties for any reason.

(vii) "Representative" of a person means (i) a shareholder, director, officer, member, manager, partner, joint venturer, owner, employee, agent, representative, independent contractor, consultant, advisor, licensor or licensee of, for, to or with such Person, (ii) an investor in such Person or lender (irrespective of whether interest is charged) to such Person or (iii) any Person acting for, on behalf of or together with such Person.

(viii) "Restricted Period" means the period commencing on the date of termination of the Employee's employment with the Protected Parties for any reason and ending on the second annual anniversary of such date, provided, however, that this period shall be tolled and shall not run during any time Employee is in violation of any provision in this Agreement.

(ix) "Territory" means (a) the state(s) or territory(ies) where Employee was assigned to work for Protected Parties, plus each state or territory contiguous thereto; (b) lists of Customers specifically assigned to and called on by Employee at any time during Employees employment and regardless of office location; (c) lists for physicians or any other referral source or client specifically assigned to or called on by Employee at any time during Employees employment and regardless of office location; (d) any other State or Territory to which the Employee directed or in which Employee performed work or employment-related activates on behalf of the Protected Parties or its Affiliates at the time of, or during the 24 month period prior to, the termination of the Employee's employment with the Protected Parties for any reason.

B.   Restrictions. During Employee's employment with Protected Parties and during the Restricted Period, the Employee agrees not to engage in any activities competitive with the Protected Party or its Affiliates, including any activities similar to those described in subsections (i) through (vi) below, except in furtherance of the Protected Parties' business. Furthermore, the Employee agrees that, except as otherwise approved in writing by the Protected Parties, during the Restricted Period, the employee will not, directly or indirectly, alone or in conjunction with any other party:

(i) engage in the Business in the Territory or market, sell or provide Products and Services in the Territory;

(ii) encourage, induce or attempt to induce any Employee of Protected Parties to terminate his/her or her employment with the Protected Parties or its Affiliates or violate any agreement with the Protected Parties or its Affiliates;

(iii) call upon, contact, solicit, divert, encourage or appropriate or attempt to call upon, contact, solicit, divert, encourage or appropriate any Customer, for purposes of marketing, selling, or providing Products and Services to such Customer or aiding any other Person or Representative in doing so;

(iv) accept as a customer any Customer of Protected Parties, for purposes of marketing, selling or providing Products and Services to such Customer;

(v) interfere with the business relationship between a Customer or, Employee of Protected Parties or its Affiliates;

(vi) be or become a Representative of any Person who engages in any of the foregoing activities;

Nothing contained herein shall restrict the ability of the Employee to purchase or otherwise acquire up to one percent (1%) of any class of securities of any enterprise (but without otherwise participating in the activities of such enterprise) if such securities have been registered under Section 12(b) or 12 (g) of the Securities Exchange Act of 1934 and free of transfer restrictions.

3. Reasonableness of Restrictions.

A. Employee has carefully read and considered the provisions this Agreement and having done so, agrees that the terms of the covenants are fair and reasonable and are reasonably required for the protection of the interests of Protected Parties, their business, their officers, their directors, and their employees. Employee represents that Employee's experience, capabilities and circumstances are such that these provisions will not prevent Employee from earning a livelihood. Employee further agrees that Employee has received valuable and adequate consideration in exchange for entering into the restrictions set out in this Agreement.

B. The Employee agrees that the covenants in this Agreement are reasonable given the highly competitive nature of the business of Protected Parties and its Affiliates and the substantial knowledge and goodwill the Employee will acquire with respect to the business of the Protected Parties and its Affiliates as result of his/her employment with the Protected Parties. To the extent that this agreement is breached, the Protected Parties stands to lose significant revenue, profits, costs, goodwill and other tangibles and intangibles in recovering or keeping those Customers, including but not limited to current and/or former patients of the Protected Parties Notwithstanding the foregoing, in the event that any provision of this Agreement is determined by a court to be invalid or unenforceable, such court may, and is hereby authorized to, reduce or limit the terms of such provision to allow it to be enforced to the maximum extent possible.

C. Employee specifically acknowledges that the Protected Parties are intended third party beneficiaries of the covenants set out in this Agreement and that any of the Protected Parties suffering harm as a result of a breach of said covenants shall be entitled to bring suit to enforce the provisions of the covenant without the necessity of joining any of the other Protected Parties and in such event, the covenants contained in the above Sections shall be deemed to have been entered into directly with the Protected Party that has suffered harm.

4.   Enforcement of, and Acknowledgement of Reasonableness of, Covenants; Injunctive Relief; Expense.

A. Employee acknowledges that the Protected Parties and its Affiliates will suffer irreparable harm in the event that the Employee breaches any of the obligations under this Agreement and that monetary damages will be inadequate to compensate the Protected Parties and its Affiliates for such breach.

B. The Employee agrees that, in the event of a breach by the Employee of any of the Employee's obligations under this Agreement, the Protected Parties will be entitled to obtain from any court of competent jurisdiction preliminary and permanent injunctive relief, without the requirement of posting any bond or any other security, and expedited discovery for the purpose of seeking relief, in order to prevent or restrain any such breach (and the Employee agrees to waive any requirement for the securing or posting of any bond in connection with such remedies); provided however, that nothing contained herein shall be construed as prohibiting a Protected Party from pursuing any other rights and remedies available for any such breach or threatened breach.

C. Protected Parties will be entitled to recover its costs incurred in connection with enforcing this Agreement, including reasonable attorneys' fees and expenses.

5. Accounting for Profits. If the Employee violates any of the Employee's obligations under this Agreement, the Protected Parties and its Affiliates will be entitled to an accounting and repayment of all profits, compensation, commissions, remunerations, or benefits that the Employee directly or indirectly has realized or  may realize as a result of, growing out of or in connection with any such violation.

6. Remedies Cumulative. The rights and remedies of the parties under this Agreement are cumulative (not alternative) and in addition to all other rights and remedies available to such parties at law, in equity, by contract or otherwise.

7. Privacy/Confidentiality of Health and Personal Information.

A. Employee agrees that in the course of his/her employment with Protected Parties, he/she will keep confidential all information required by law to be kept confidential. The Employee agrees to comply with all state and federal privacy and security laws and standards applicable to Protected Health Information ("PHI") including, but not limited to, those regulations promulgated pursuant to the Health Insurance Portability and Accountability Act of 1996 ("HIPAA").

B. Employee further agrees that any pattern of activity or practice by the Employee which constitutes a material breach or violation of the Employee's obligations under this section shall be cause for immediate termination by the Protected Parties The Employee assures the Protected Parties that the Employee will use appropriate safeguards to prevent the unauthorized use or disclosure of PHI of which the Employee becomes aware. PHI, for purposes of this section, shall be defined as contemplated by HIPAA in 45 CFR 164.501.

C. As related to this section, to the extent that the Protected Parties is found to have violated HIPAA or any other law as a direct result of Employee's action(s) or inaction(s), Employee will be liable to the Protected Parties for any and all losses and/or damages, including but not limited to reasonable attorneys' fees and costs, resulting from said action(s) or inaction(s), whether intended or unintended.

8. Geographic Territory. The Employee hereby acknowledges that Employee's geographical or customer territory assignment may change from time to time and nothing in this agreement confers a guaranteed territory or customer base to the Employee.

9. Third Party Beneficiary. Employee specifically acknowledges that the Protected Parties are intended third party beneficiaries of the covenants set out in this Agreement and that any of the Protected Parties suffering harm as a result of a breach of said covenants shall be entitled to bring suit to enforce the provisions of the covenant without the necessity of joining any of the other Protected Parties and in such event, the covenants contained herein shall be deemed to have been entered into directly with the Protected Party that has suffered harm.

10. Waiver. No failure to exercise, and no delay in exercising, by either party hereto, any right, power or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power or privilege hereunder preclude any other or further exercise thereof, or the exercise of ny other right, power or privilege.

11. **GOVERNING LAW. EMPLOYEE ACKNOWLEDGES THAT EMPLOYEE'S EMPLOYMENT HAS SIGNIFICANT CONTACTS WITH TENNESSEE. THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF TENNESSEE.**

12. Effect. This Agreement shall be binding upon, and shall inure to the benefit of, Protected Parties and the Employee and their respective heirs, legal representatives, executors, administrators, successors and assigns and shall inure to the benefit of the now or hereafter existing subsidiaries and Affiliates of the Protected Parties and their respective successors and assigns.

13. Unenforceability. The parties agree that the provisions of this Agreement are severable. Should any one or more of the provisions of this Agreement be determined to be illegal or unenforceable, the remainder of this Agreement shall not be affected thereby and each term and provision of this Agreement shall be valid and enforceable to the fullest extent permitted by law. In particular, in the event the covenants in this Agreement shall be determined by any court of competent jurisdiction to be invalid or unenforceable by reason of extending for too great a period of time or over too great a geographical area, or by reason of being too extensive in any other respect, the covenants shall be interpreted to extend only over the maximum period of time, the maximum geographical area and the maximum extent in all other respects that the court shall determine is valid and enforceable.

14. Headings. All headings herein are for ease of reference only and shall not be construed to enlarge or limit the provisions of this Agreement.

15. Employment. No provision contained herein shall be deemed to guarantee Employee any fixed term of employment or continued employment by Protected Parties or any subsidiary or affiliate thereof. References in this Agreement to employment by a Protected Party or a subsidiary or affiliate thereof shall include employment thereby and the status as a leased or loaned employee.

16. Syntax. As the context of this Agreement requires, the masculine gender shall include the feminine or the neuter.

17. References to "Protected Parties" refers to each alone, one or more, or all of the Protected Parties and their Affiliates as appropriate to the particular Employees situation and employment.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement on the date and year first above written, Protected Parties acting through its duly authorized officer.

_____   Date: 3-3-11
EMPLOYEE

Scott Bonnema
Employee's Printed Name


ACCREDO HEALTH, INCORPORATED
For Itself and all Protected Parties

By: _____   Date: 3/1/11
Title: VP Legal

# EXHIBIT B



## *Critical Care Systems*

### CONFIDENTIALITY AGREEMENT

I __Jodi Matott__ , ("I" or "Me"), hereby recognize that Critical Care Systems, Inc. and its affiliates ("Company") are engaged in the business of specialty pharmacy, and disease management services and that it is part of my responsibility as an employee to assist the Company in fulfilling its mission, as it may be amended from time to time. I understand the importance of protecting the Company's rights to all of its proprietary and confidential information, adhering to the highest of business and ethical standards, and rigorously complying with applicable laws, rules, and regulations. Therefore, prior to and in consideration of the compensation to be paid and my employment by Company, I hereby agree as follows:

1. **Confidential Information.** Confidential Information includes all information that is proprietary and confidential to the Company, including without limitation all of Company's unpublished inventions; results of research and development; development services and advisors; wound care management protocols, processes, and algorithms; medical records; trade secrets; financial and business strategies, information, and policies; computer systems, software, hardware, firmware, and documentation; proprietary products or services; the names of and relationship with suppliers, customers, patients, referral sources, and business partners; confidential, proprietary, or trade secret information submitted to Company by suppliers, employees, consultants to or co-venturers with Company for study, evaluation, or use; and any other information not generally known to the public which, if misused or disclosed, could adversely affect the business of Company. Confidential Information does not include information which (1) was in my possession or was known to Me prior to receipt from Company, (2) is or becomes public knowledge without my fault and without breach of any duty to or agreement with Company, or (3) is or becomes lawfully available to Me from a source other than Company without breach of any duty to or agreement with Company.

2. **Protection of Confidential Information.** During and after my employment with Company, I will (1) use Confidential Information only as may be necessary and proper to perform

my duties for Company; (2) keep in strictest confidence and trust all Confidential Information that is disclosed to Me or to which I have access; (3) comply with all applicable policies and standard procedures established by Company to maintain the secrecy and confidentiality of Confidential Information; and (4) not, directly or indirectly, without the prior written consent of Company, copy, disseminate, or otherwise disclose Confidential Information to any person or entity.  I will provide all reasonable assistance that Company requests to maintain the secrecy and confidentiality of Confidential Information.

3.    **Work Product.**  "Work Product" means any idea, invention, discovery, development, design, technique, process, improvement, plan, work of authorship, computer program, data, information, enhancement, or other work product developed, conceived, reduced to practice, or learned within or outside my normal hours of employment while employed by Company and related to, connected with, or arising out of the business, plans or activities of Company.  Work Product does not include any of my work product that (1) was developed entirely on my own time; (2) was not made with the use of Confidential Information or any equipment, supplies, or facilities of Company; (3) is unrelated, directly or indirectly, to the business of Company; and (4) did not result from any work performed by Me for the Company.

4.    **Duties to Disclose Work Product.**  I will promptly disclose to Company all of my work product to permit Company to determine whether it is Work Product as defined above and thus within the scope of my employment.  Work Product within the scope of my employment shall be deemed to be a work made for hire and, because of my employment by Company, the sole property of Company.

5.    **Assignment and Protection of Work Product.**  I hereby irrevocably assign to Company all right, title, and interest in and to Work Product and shall, at the expense and on behalf of Company, do everything reasonably necessary for Company to obtain, preserve, and protect Company's right, title, and interest in and to Work Product.  This will include preparing and signing all documents Company may deem necessary to obtain and maintain patents, copyrights, trade secrets, trademarks, service marks, and other rights within the United States of America or anywhere in the world.  This obligation shall be binding upon Me or my legal representative and continue beyond the termination of my employment with Company, subject to reasonable compensation by Company for my time and expenses.  Should Company be unable, after reasonable effort, to obtain my signature on any

document necessary to apply for or prosecute any of the above rights for any reason, I hereby irrevocably designate and appoint Company or its officers and agents as my agent coupled with a power of attorney to act for and in my behalf and stead to do everything necessary to accomplish the above.

6.     **Previous Work Product.**  I will disclose below all work product that has been generated, conceived, first reduced to practice, developed, or otherwise learned by Me, alone or jointly with others, prior to my employment by Company and, by doing so, remove it from the applicability and operation of this Agreement:

_____

_____

_____

My signing this Agreement shall be my representation and warranty that the above list is complete and that any other Work Product is subject to this Agreement.

7.     **Release of Information About Me.**  Should the Company be requested or required to furnish to others information maintained by the Company about Me, I hereby authorize Company to release that information which, in Company's judgment, there is some basis for releasing.  This includes responding to a subpoena; complying with applicable laws, rules, or regulations; responding to a request for information from any governmental agency or department; furnishing a resume of my background to an existing or potential business partner or customer of Company; or responding to a request for information from a prospective employer.

8.     **Employment at Will.**  My employment is "At Will" with no fixed term or duration and may be ended by either me or Company at any time, either with or without cause, unless the parties agree to a stated term in a written Employment Agreement.

9.     **Duty of Loyalty/ Code of Business Practice.**  I acknowledge that I owe a duty of loyalty to Company and, while employed, will use my best efforts to serve the interests of Company.  I have been given a copy of the Company's Code of Business Practice ("Code") and have read and understand its contents and, while employed, will comply with the letter and spirit of the Code.  I hereby represent that, at the time of my employment, I have no interest or other rights, duties, or

obligations which are inconsistent with or in conflict with the business of Company, except as disclosed below:

_____

_____

_____

I will notify Company immediately should any conflict of interest arise during my employment.

10.     **Previous Employment.** I represent to Company that the duties and obligations of this Agreement and my employment with Company do not breach any agreements arising out of previous employment that restrict my employment or require that I keep in confidence information acquired by Me prior to the execution of this Agreement. I have not entered into and will not enter into any agreement in conflict with this Agreement or the Code. I have not brought and will not bring to Company or use in the performance of my duties at Company any materials or documents of any former or current employer, customer, or business partner that are not generally available to the public, unless I have obtained express written authorization to do so from the employer, customer, or business partner.

11.     **Delivery of Materials Upon Employment Termination.** Upon termination of my employment with Company, I shall immediately deliver to Company all originals and copies or other reproductions of documents, papers, electronically stored data and any other information, regardless of form, format, or medium, in my possession or control which relate to, are connected with, or arise out of my employment. I will also return all other Company property including, but not limited to, computers, keys, supplies, identification cards, and other Company property that may be in my possession at my place of work or elsewhere.

12.     **Restrictions on Activities.** For the term of my employment with Company and for a period of one year following voluntary or involuntary termination of my employment, I will not, for myself or on behalf of any person or entity, without the prior written consent of Company, within a territory equal to a seventy-five mile radius of my office at Company and within any geographical area or territory for which I was assigned responsibility at the time of my termination, (1) solicit, employ, hire, or contract for services with any employees or former employees of Company; or (2) solicit, entice or induce any person or entity in a business relationship with the Company to enter

into a business relationship with any other person or entity engaged in any activity competitive with the Company or to cease doing business with the Company.

13.     **Enforcement.**   I understand that in the event of a breach or threatened breach of the provisions of this Agreement, Company's remedies at law will be inadequate and Company should be entitled to an injunction to enforce these provisions without a bond or other security; but nothing herein should be construed to preclude Company from pursuing any remedy at law or in equity for any such breach or threatened breach.

14.     **Citizenship.**   I represent that I am either (1) a citizen or national of the United States, (2) an alien lawfully admitted for permanent residence, or (3) an alien who is authorized under a valid work permit acceptable to Company in accordance with applicable laws and regulations to be hired, recruited, or referred for employment with the Company.

15.     **General.**   This Agreement is for the benefit of both Me and Company.  It will be governed by and construed in accordance with the laws of the State of New Hampshire without applying the conflicts of law rules of that state.  The rights, duties, and obligations of this Agreement shall survive the termination of my employment by Company in any capacity and shall inure to the benefit of and shall be binding upon my heirs and personal representatives and the successors of Company. Should any part of this Agreement be found by a court of competent jurisdiction to be invalid or unenforceable, the remainder of this Agreement shall not be affected and shall be valid and enforced to the fullest extent permitted by law and the invalid or unenforceable part shall, to the maximum extent permitted by law, be reformed by a court to be enforceable to lawfully carry out the intent of the parties.  This Agreement and the Offer Letter are the entire agreement between me and Company and all prior written or oral promises or representations are incorporated.   No amendments or modifications of this Agreement will be binding upon Me or Company unless in writing and signed by both Me and Company.

Employee Signature: _____     Date: _10-24-08_

Please Print Name: _Jodi Matott_____